FILED
2016 AUG 19 PM 4:57

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| YOCHANAN MARKMAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | |
| PLAINTIFF, | § | |
| V. | § | CAUSE NO. 1:15-CV-681-LY |
| WHOLE FOODS MARKET, INC., JOHN P. MACKEY, WALTER E. ROBB III, GLENDA JANE FLANAGAN, A.C. GALLO, DAVID LANNON, AND KENNETH J. MEYER, | § | |
| DEFENDANTS. | § | |

**ORDER ON MOTION TO DISMISS**

Before the court are Defendants' Motion to Dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws (Clerk's Doc. No. 57); Plaintiff's Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws (Clerk's Doc. No. 59); and Defendants' Reply Memorandum of Law in Support of Motion to Dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws (Clerk's Doc. No. 60).

Having considered the motion, the response, the reply, the complaint, and the applicable law, the court will grant the motion for the reasons that follow.

## I. BACKGROUND

This is a securities-fraud action brought on behalf of a proposed class of investors who purchased Whole Foods Market, Inc. ("Whole Foods") common stock between July 31, 2013, and July 29, 2015 (the "class period"). Lead Plaintiff Employees' Retirement System of the State of Hawaii (the "Retirement System") asserts violations of Section 10(b) of the Securities

Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against Whole Foods, co-founder and co-Chief Executive Officer John P. Mackey ("Mackey"), co-Chief Executive Officer Walter E. Robb ("Robb"), Chief Financial Officer Glenda Jane Flanagan ("Flanagan"), President and Chief Operating Officer A.C. Gallo ("Gallo"), and Executive Vice Presidents of Operations David Lannon ("Lannon") and Kenneth J. Meyer ("Meyer") (collectively, "Defendants"). The Retirement System also alleges control-person liability under Section 20(a) of the Exchange Act against Mackey, Robb, Flanagan, Gallo, Lannon, and Meyer (collectively, the "individual defendants").

Whole Foods is a nationwide retailer of natural and organic foods. As a publicly-held company with equity securities traded on the NASDAQ stock market, Whole Foods is subject to the oversight of the United States Securities and Exchange Commission ("SEC") and must comply with detailed reporting requirements pursuant to the Exchange Act and SEC regulations. *See* 15 U.S.C. § 78m; 17 C.F.R. § 240.13a-1. The Retirement System alleges that throughout the class period, Whole Foods—through the individual defendants—made false and misleading statements about the company's competitive prices, high standards for quality and transparency, and favorable financial results. The Retirement System claims that statements made on these subjects in press releases, phone calls with investors, and Forms 10-K and 10-Q[1] were materially misleading because they obscured the reality that Whole Foods often overcharged customers by putting inaccurate food-weight labels on prepackaged foods.

The Amended Class Action Complaint ("complaint"), the current live pleading of the Retirement System, alleges that Whole Foods was the subject of investigations by state regulators in California and New York during the class period stemming from purported "tare

[1] Forms 10-Q and 10-K are quarterly and annual reports that include statements of financial performance and must be filed with the SEC by certain large companies, including Whole Foods. *See* 17 C.F.R. § 240.13a-13; *id.* § 249.310.

weight errors" that caused certain of Whole Foods' products to be mislabeled and mispriced in violation of state law. These investigations ultimately resulted in settlement payments of $800,000 and $500,000, respectively, an injunction prohibiting Whole Foods from "[k]nowingly marking a short weight or taking a false tare on any container," and implementation of certain "control and reporting mechanisms" at Whole Foods stores. While the investigations were ongoing, Defendants made statements and reported financial results that the Retirement System contends were materially false and misleading due to the alleged underlying practices of "routinely overcharg[ing] customers and engag[ing] in known and preventable weights and measures violations." The Retirement System alleges that Whole Foods' stock price was artificially inflated during the class period because of the false and misleading statements, which resulted in financial loss to purchasers of Whole Foods common stock when the truth was revealed.

*A. Events and Statements Giving Rise to Suit*

Following is a brief outline of the events and allegations giving rise to this lawsuit as stated in the complaint, together with examples of the kinds of statements Defendants made.

On July 31, 2013, the first day of the class period, Whole Foods reported its third-quarter fiscal year 2013 financial results.[2] Whole Foods reported net income of $142 million, sales of over $3 billion, gross profit of over $1.1 billion, and comps—comparable store sales growth—of 7.5%. The press release announcing the results stated that they were driven by "improvements in cost of goods sold," as well as "outstanding operational performance." The financial results

---

[2] Whole Foods operates on a 52 or 53 week fiscal year, which ends the last Sunday in September. *Shareholder Resources: FAQs*, WHOLE FOODS MARKET–INVESTOR RELATIONS, http://investor.wholefoodsmarket.com/investors/shareholder-resources/faqs/default.aspx (last visited August 17, 2016). The first quarter of each fiscal year is 16 weeks, the second and third quarters are 12 weeks, and the fourth quarter is 12 or 13 weeks. *Id.* The third quarter of fiscal year 2013 ended July 7, 2013.

were also reported in the company's Form 10-Q for the third quarter of fiscal year 2013, which was signed by Flanagan. On the same day, Meyer stated, during a conference call with analysts and investors, that "compared to any other competitor for the exact same items [Whole Foods has] great prices."

The Retirement System alleges that these statements and results were false and misleading because, at the time of their dissemination, Whole Foods was engaging in "systemic and pervasive overpricing and mispricing of prepackaged foods caused by routine tare-weight errors, including the widespread practice of failing to deduct the tare weight from a label." The Retirement System asserts that Whole Foods should have disclosed this practice as a driver of its favorable financial results and should also have disclosed that the company was under investigation in California for the same reason. The Retirement System further claims that the Form 10-Q should have disclosed the investigation and practices as "events or uncertainties that defendants reasonably expected would have a material unfavorable impact on revenues" pursuant to Securities and Exchange Commission ("SEC") Regulation S-K Item 303, 17 C.F.R. § 229.303. Finally, the Retirement System alleges that Whole Foods' financial statements were misleading because the statements violated Generally Accepted Accounting Principles ("GAAP")[3] by reporting revenue that was not appropriately "recognized."

The Retirement System repeats all of the above allegations, in substantially similar form, with respect to Whole Foods' reporting of financial results and attendant Forms 10-Q for the fourth quarter of fiscal year 2013, the first quarter of fiscal year 2014, the second quarter of fiscal year 2014, the third quarter of fiscal year 2014, the fourth quarter of fiscal year 2014, the first

[3] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC regulations provide that "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the [SEC] has otherwise provided." 17 C.F.R. § 210.4-01(a)(1).

quarter of fiscal year 2015, the second quarter of fiscal year 2015, and the third quarter of fiscal year 2015. The Retirement System also repeats the above allegations with respect to Whole Foods' Forms 10-K for fiscal year 2013 and fiscal year 2014.

While Whole Foods was under investigation for mislabeling goods in California from November 2013 through May 2014, Defendants made a number of statements to investors about Whole Foods' price competitiveness and corporate philosophy that the Retirement System alleges were misleading.

Mackey stated during a conference call on November 6, 2013 that Whole Foods had "narrowed the price gap versus [its] competitors on known value items . . . while continuing to raise the bar even higher on our standards of transparency." At various other times through May of 2014, Robb, Mackey, Lannon, and Gallo made statements about "improvements" in Whole Foods' "competitive price positioning," the implementation of a "value strategy" at Whole Foods stores, the "positive impact of lowering" prices, and the company's general focus on "being really competitive with our prices."

During the same period, Robb made public statements about Whole Foods' commitment to "transparency" and "the quality of the standards behind the [company's] products."

The Retirement System alleges that these statements were materially misleading because, at the time they were made, (1) Whole Foods was engaged in "systemic and pervasive overpricing and mispricing of prepackaged foods caused by routine tare weight errors," (2) California state regulators were investigating Whole Foods for that reason, and (3) Whole Foods failed to disclose both its practice of mispricing goods and the California investigation of that practice.

On June 11, 2014, The city attorneys for Los Angeles, Santa Monica, and San Diego, California filed a complaint against Whole Foods in state court on behalf of the State of California, "alleging that Whole Foods violated California law by selling packaged items that contained less than the amount stated on the packaging, failing to deduct the tare weight when selling prepackaged items and selling items by unit when California law required them to be sold by weight."

Seven days after the complaint was filed, Whole Foods and the State of California agreed to settle the state's claims and stipulated to entry of a Final Judgment and Permanent Injunction Pursuant to Stipulation in the state-court action. *See People of the State of Cal. v. Whole Foods Mkt. Cal., Inc.*, No. SC122679, Final Judgment and Permanent Injunction Pursuant to Stipulation (Cal. Super. Ct. L.A. Cty. June 18, 2014). Pursuant to the stipulated judgment, Whole Foods was required to pay a total of $68,394.11 to various California counties for "investigative costs," $630,000 to the State of California "as civil penalties," and $100,000 to the CACASA Quality Control Trust under the doctrine of *cy pres* as "restitution to consumers who may have unknowingly been charged an incorrect price for merchandise." *Id.* at 9–10. Whole Foods was also enjoined for five years from—among other things—"[k]nowingly marking a short weight or taking a false tare on any container," and the company agreed to implement certain control and reporting mechanisms at its stores. *See id.* at 4–8. The judgment specified that nothing in the complaint, negotiations, stipulation, judgment, or actions to carry out the stipulation and judgment would "be deemed, considered or construed as any type of admission or concession by [Whole Foods] . . . of any fault, omission, or wrongdoing." *Id.* at 11.

On June 26, 2014, following entry of the stipulation and judgment, Whole Foods issued an "open letter to Whole Foods Market shoppers"[4] in which the company acknowledged the California case and expressed its disappointment "that some customers who purchased weighed and measured items . . . may have been slightly overcharged unintentionally." The letter also reaffirmed Whole Foods' commitment to "transparency and accuracy" and promised that the company would "do better."

Despite the weights-and-measures issues in California, the Retirement System asserts that on July 30, 2014, "[D]efendants, with knowledge or recklessness, continued to make . . . materially false and misleading statements . . . while failing to disclose continuing on-going violations and facts known to the Company." For example, on a conference call with analysts, media representatives, and investors, Robb identified "value efforts" as a "key element in driving sales growth," alluded to "opportunities to narrow price gaps on select known value items," and spoke of Whole Foods' "leadership around quality and transparency."

The Retirement System alleges that these statements were materially misleading because they "omitted the . . . true facts" that (1) Whole Foods was continuing to overcharge customers by way of "known and preventable weights and measures violations," and (2) Whole Foods had "failed to implement sufficient processes to adequately address and prevent" the tare weight errors identified in California.

The Retirement System alleges that a short time after Whole Foods settled the California claims, similar weights-and-measures issues began to arise in New York. Specifically, the Retirement System claims that in August 2014, the company was "once again caught overcharging customers in Albany, New York for prepackaged foods that weighed less than the

[4] All documents identified in this order are "incorporated into the complaint by reference," and thus the court may appropriately consider them in connection with the present motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

labels indicated." Additionally, the New York City Department of Consumer Affairs began investigating allegations of mispricing based on weights-and-measures errors at Whole Foods stores in the city.

During this period, Whole Foods press releases and SEC filings emphasized the company's desire to be a "deeply responsible company" that provided "transparent information" to its customers. Robb, Mackey, and Lannon also made statements to investors about Whole Foods' efforts to "narrow price gaps on select known value items," the potential for "more competitive produce pricing," and Whole Foods' overall desire to be a leader in "transparency" and "accountability."

The Retirement System alleges that these statements were materially misleading for much the same reason previous similar statements were misleading—namely, the statements "omitted" the true facts regarding Whole Foods' labeling and pricing practices and the attendant investigation in New York City.

After several months of investigating, the New York City Department of Consumer Affairs issued a press release on June 24, 2015, stating that it had found a "systemic problem with how products packaged for sale at Whole Foods are weighed and labeled." The press release indicated that individual packages were "routinely not weighed" or were "inaccurately weighed" across New York City stores, "resulting in overcharges for consumers." The press release further suggested that the "potential number of violations" Whole Foods could face for prepackaged goods in New York City stores was "in the thousands."

In response to the Department of Consumer Affairs press release and an associated article in the *New York Times*, Robb and Mackey posted a video online admitting that Whole Foods

"made some mistakes" and stating that the company was implementing training and auditing processes in order to address weighing and labeling issues.

On July 29, 2015, the last day of the class period, Whole Foods released its third-quarter financial results for fiscal year 2015. The complaint alleges that the results "fell far below analyst revenue and earnings expectations due to slow sales."

On the same day, Robb acknowledged during a conference call with investors that sales "dropped sharply in week 11, after [the] New York City weights and measures audit received national media attention." Robb also emphasized that the issues revealed by the New York investigation were "not systematic, but rather [were] caused by inadvertent human error."

The next day, July 30, 2015, Whole Foods common stock declined $4.74 per share on heavy trading volume to close at $36.08 per share.

After another lackluster earnings report for the fourth quarter of fiscal year 2015, Mackey spoke to investors on November 4, 2015 about the need to take steps "to regain . . . sales momentum." The Retirement System asserts that "[o]n this disclosure, the price of Whole Foods common stock declined $1.16 between November 3, 2015 and November 5, 2015 on very heavy trading volume," and that "Whole Foods' sales have yet to recover from the pricing scandal and revelations that the Company routinely overcharged customers."

Whole Foods ultimately agreed to pay $500,000 in order to settle the New York City mislabeling claims. As part of the settlement, Whole Foods agreed to conduct in-store audits and implement certain policies and procedures for weighing and labeling prepackaged goods. On December 23, 2015, Whole Foods signed a consent order setting forth its obligations under the settlement agreement. The consent order specified that the New York City Department of

Consumer Affairs "did not find any evidence of systematic or intentional misconduct by any individual across the northeast region of the company."

*B. Procedural History*

This action was originally brought by Yochanan Markman—who purchased Whole Foods common stock during the class period—on August 7, 2015. This court appointed the Retirement System as lead plaintiff on October 28, 2015. The Retirement System filed the current complaint on January 8, 2016.[5] Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act ("Reform Act") on February 19, 2016, arguing that the Retirement System failed to adequately plead the essential elements of (1) false or misleading statements of material fact, (2) scienter, and (3) loss causation.

## II. LEGAL STANDARDS

*A. Elements of a Section 10(b) Securities-Fraud Claim*

Section 10(b) of the Exchange Act prohibits the use, in connection with the purchase or sale of a security, of "any device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b). SEC Rule 10b-5, in turn, makes it unlawful for any person, in connection with the purchase or sale of a security, to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. The elements of a private securities-fraud claim based on Section 10(b) and Rule 10b-5 are (1) a material misrepresentation or omission; (2) scienter—a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss;

[5] Before the Retirement System was appointed as lead plaintiff, Yochanan Markman filed an amended complaint. Thus, although the current live pleading is the first amendment by the Retirement System, there have actually been two amended complaints filed in this case.

and (6) loss causation—"a causal connection between the material misrepresentation and the loss." *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 238–39 (5th Cir. 2009)).

*B. Standard of Review*

In considering a motion to dismiss pursuant to Rule 12(b)(6), this court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Lormand*, 565 F.3d at 232. In order to avoid dismissal, a complaint must ordinarily only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8. Under Rule 8, a complaint need not contain detailed factual allegations, but it must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 570 (2007).

"Securities fraud claims brought by private litigants" are "also subject to the pleading requirements imposed by the [Reform Act]." *Owens*, 789 F.3d at 535. "At a minimum, the [Reform Act] pleading standard incorporates the 'who, what, when, where, and how' requirements" of Federal Rule of Civil Procedure 9(b). *Id.* (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 349–50 (5th Cir. 2002)). This means that "a plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities-fraud claim must, to avoid dismissal pursuant to Rule 9(b) and [the Reform Act]," identify the allegedly misleading statement with particularity, explain why the statement was misleading, identify the speaker, state when and where the statement was made, and plead with particularity what the person making the misrepresentation obtained thereby. *Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003). Additionally, to adequately plead the element of scienter, "the [Reform Act] requires a plaintiff to 'state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind.'" *Owens*, 789 F.3d at 535 (quoting 15 U.S.C. § 78u-4(b)(2)). In the Fifth Circuit, "[t]he required state of mind [for scienter] is an intent to deceive, manipulate, or defraud or severe recklessness." *Lormand*, 565 F.3d at 251 (quoting *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)).

## III. ANALYSIS

Defendants argue that the Retirement System has failed to adequately plead three essential elements of a Section 10(b) securities-fraud claim: (1) material misrepresentation or omission, (2) scienter, and (3) loss causation. The court will address each element in turn.

### *A. Material Misrepresentation or Omission*

The statements forming the basis of the Retirement System's securities-fraud claim fall into three general categories: (1) aspirational statements about Whole Foods' commitment to transparency and quality, (2) statements about Whole Foods' price competitiveness and value initiatives, and (3) Whole Foods' financial results. Defendants contend that the complaint fails to identify any of these statements as actionably false or misleading, because (1) aspirational statements made by the individual defendants are immaterial as a matter of law, (2) forward-looking statements about price competitiveness and value initiatives are protected by one of the Reform Act's safe-harbor provisions, and (3) the Retirement System does not and cannot identify any specific transactions or results that render Whole Foods' financial statements false. The court agrees that the complaint fails to adequately allege the existence of any materially false or misleading statements.

1. Aspirational Statements

Throughout the class period, Defendants made various statements in press releases and conference calls with investors about Whole Foods' commitment to quality and transparency. As one example, Mackey stated during a conference call on November 6, 2013, that Whole Foods was "continuing to raise the bar even higher on our standards of transparency." The complaint alleges that this statement and others like it were materially false and misleading when made because Whole Foods' ostensibly "pervasive" practice of mislabeling and mispricing prepackaged foods meant that the company was not, in fact, committed to transparency or quality. However, "generalized positive characterization[s] [are] not actionable under the securities laws." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003). In other words, "[a]llegations that amount to little more than corporate 'cheerleading' are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 748 (S.D. Tex. 2012) (citing *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)); *see also Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009) ("Courts have consistently found immaterial 'a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important . . . .'" (quoting *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570–71 (6th Cir. 2004))).

Here, the statements in the complaint concerning Whole Foods' commitment to transparency and quality fall squarely in the category of inactionable puffery. For instance, the statement "[w]e seek to be a deeply responsible company in the communities where we do business around the world, providing ethically sourced, high-quality products and transparent information to our customers" is precisely the type of vague, loosely optimistic affirmation that courts have repeatedly found immaterial as a matter of law. *See, e.g.*, *Boca Raton Firefighters and Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (statement about company's "dedication towards transparent and independent decision-making process" not material); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 344 (S.D.N.Y. 2015) ("[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery' . . . .").

The court therefore concludes that the complaint fails to allege material falsity with respect to any generalized statements about Whole Foods' commitment to quality or transparency.

2. Statements About Price Competitiveness and Value Initiatives

The second class of statements alleged to be materially false and misleading concerns Whole Foods' efforts to "narrow[] the price gap versus [its] competitors" as part of an overall "value strategy." For example, during a conference call with investors on May 6, 2014, Gallo stated that Whole Foods was "really focused on being really competitive with [its] prices," and Mackey followed up by explaining that "selling the same amount of product . . . at a lower price" meant sales might initially dip, but ultimately sales would improve as "the overall perception of your basic price value ratio is improved." Likewise, Robb stated during a different conference call that he believed Whole Foods' "value efforts" would "continue to be a key element in

driving sales growth over the long-term," and he noted that the company's "focus going forward" would be on areas where the company saw "opportunities to narrow price gaps on select known value items," among other things. The complaint alleges that statements about Whole Foods' efforts to reduce its prices were materially misleading when made, because Whole Foods failed to disclose that it was under investigation for—and was in fact—overcharging customers based on inaccurate food-weight labels.

Defendants argue that any statements about Whole Foods' pricing initiatives and value strategies are protected under the Reform Act's safe-harbor provision for forward-looking statements. *See* 15 U.S.C. § 78u–5(c). However, although some of the statements identified in the complaint can properly be characterized as forward-looking, other statements on the subject of price competitiveness—such as Robb's statement that internal pricing surveys "showed improvements . . . in a competitive price positioning across virtually all competitors in all areas"—are unmistakably assertions of existing fact to which the safe-harbor provision is inapplicable. *See Carlton v. Cannon*, __F. Supp. 3d__, 2016 WL 2346943, at *15 (S.D. Tex. May 4, 2016) (statement that company had "increased [its] overall process yield of biomass" not forward-looking). Nevertheless, the court need not decide whether (and to which statements) the safe harbor applies, as the complaint fails to adequately allege that any of the statements about Whole Foods' pricing initiatives, whether forward-looking or not, were false or misleading.

There is nothing in the complaint to suggest that Defendants' statements about price competitiveness were false when made. In other words, the complaint is devoid of any allegation that Whole Foods was *not* actually working to reduce its prices in order to make itself more competitive with other supermarkets. This being the case, the Retirement System's theory appears to be that statements about Whole Foods' pricing initiatives were materially misleading

because they omitted facts about Whole Foods' labeling problems and the attendant investigations. In this regard, "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Rather, liability for an omission under Section 10(b) exists only if statements *made* give rise to a duty to disclose by "affirmatively creat[ing] an impression of a state of affairs that differs in a material way from the one that actually exists." *Shaw Group*, 537 F.3d at 541 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Put another way, "[a] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement." *Id.* (quoting *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002)). Thus, in order to adequately plead a Section 10(b) securities-fraud claim based on omissions, a plaintiff must "plead the type of facts omitted, the place in which the omissions should have appeared, and *the way in which* the omitted facts made the representations misleading." *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) (emphasis added) (quoting *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004)).

In the present case, none of the statements identified by the Retirement System as misleading relate to weights and measures or labeling specifically, nor do they address the accuracy of Whole Foods' pricing more generally.[6] For this reason, the complaint fails to set forth any allegations indicating how the statements Defendants did make created a duty on their part to disclose potentially inaccurate food prices or investigations into those prices. *See Shaw Group*, 537 F.3d at 541 (omission of information about problems with business partner did not

---

[6] The only statement quoted in the complaint that relates to accuracy is Whole Foods' assurance in its "open letter to Whole Foods Market shoppers" that the company "always strive[s] for transparency and accuracy in everything [it] do[es]." However, the complaint does not allege that this statement was misleading, and it would regardless be considered inactionable puffery. *See Strougo*, 105 F. Supp. 3d at 344.

make announcement of venture misleading where announcement "neither stated nor implied anything about" history of relationship). Nothing in the complaint suggests that statements regarding Whole Foods' attempts to reduce prices across the board in order to remain competitive with lower-cost supermarkets had anything to do with whether all of Whole Foods' products were *accurately* priced with respect to each product's net weight. If a more nuanced connection between pricing based on inaccurate food weight and Whole Foods' projections about value strategies existed, the complaint has failed to highlight such a connection.

Furthermore, although it is true that a company might in some instances make statements that create a duty to disclose an ongoing investigation into the company's business practices, the existence of an investigation, standing alone, does not automatically give rise to such a duty. *See In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 911 n.4 (W.D. Tex. 2008) (no allegation of duty to disclose SEC investigation into accounting practices); *In re Lions Gate Entm't Corp. Sec. Litig.*, __F. Supp. 3d__, 2016 WL 297722, at *8 (S.D.N.Y. Jan. 22, 2016) ("[A] government investigation, without more, does not trigger a generalized duty to disclose."). Thus, in the absence of allegations explaining how the California and New York investigations rendered specific statements made by Defendants materially misleading, the complaint does not suggest that Whole Foods defrauded investors by failing to disclose the existence of those investigations.

3. Financial Results

The third class of statements alleged to be materially false and misleading consists of Whole Foods' press releases and SEC filings setting forth the company's quarterly and annual financial results between 2013 and 2015. The complaint alleges that Whole Foods' statements of financial results during this period were misleading because (1) the results were "driven in part by systemic and pervasive overpricing and mispricing of prepackaged foods caused by routine

tare weight errors," (2) the financial statements violated GAAP by reporting revenue that was not appropriately "recognized," and (3) Whole Foods' Forms 10-Q should have disclosed the mispricing practices and investigations as "events or uncertainties that defendants reasonably expected would have a material unfavorable impact on revenues" pursuant to SEC Regulation S-K Item 303, 17 C.F.R. § 229.303.[7] The court concludes the allegations in the complaint are insufficient to support any of these theories.

First, the complaint presents no particularized factual allegations from which to draw the inference that Whole Foods' statements of financial performance were false merely because some unidentified customers may have paid for items that were priced in reliance on inaccurate food weights and measurements. The Retirement System does not assert that Whole Foods' sales, net income, or gross profit were factually different from what Whole Foods reported; rather, the complaint simply alleges that the company's statements of financial performance were false when made because they were "driven" by the sale of items that were inaccurately weighed—and thus, in some cases, ostensibly sold at higher prices than their actual weights warranted. Yet the complaint does not state with particularity how the sale of inaccurately

---

[7] The Retirement System also alleges that the Sarbanes-Oxley certifications accompanying Whole Foods' Forms 10-Q and 10-K and signed by Mackey, Robb, and Flanagan were false. The Sarbanes-Oxley Act requires signing officers of a company's financial statements to "certify that they are 'responsible for establishing and maintaining internal controls [and] have designed such internal controls to ensure that material information . . . is made known to such officers . . . .'" *Cent. Laborers' Pension Fund v. Integrated Elec. Serv. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007) (quoting 15 U.S.C. § 7241(a)(4)). The Retirement System alleges that the certifications in this case were false because they affirmed the existence of "disclosure controls" that were adequate to ensure the "reliability" of Whole Foods' "financial reporting," while in reality Whole Foods' "internal controls were not adequately designed and sufficient to prevent widespread weights and measures violations." The court concludes that this allegation is insufficient, as the complaint conflates disclosure controls regarding financial reporting with controls regarding weights and measures, and the complaint fails to state with particularity any specific controls that were lacking such that the certifications were rendered false.

weighed items contributed to the falsity of any specific financial results.[8] *See Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 698 (S.D. Tex. 2013) (allegation that misrepresentation extended to company's reported margins was insufficient because plaintiff "did not allege what [the] impact [on margins] was").

The Retirement System's allegations with respect to GAAP violations are similarly deficient. The complaint presents no basis on which to conclude that Whole Foods recognized revenue before its products were actually exchanged for cash or claims to cash. Rather, the Retirement System's allegations of GAAP violations appear to be based on the theory that because the prices of some items stemmed from inaccurate food weights, Whole Foods did not "earn" the entirety of its revenues. In support of this theory, the complaint quotes from the Financial Accounting Standards Board's Accounting Standards Codification Topic 605 on Revenue Recognition, which explains that "revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." However, even assuming that the actual sale of an item at a stated price cannot constitute "substantial[] accomplish[ment]" on the part of the seller where the stated price is based on an inaccurate weight, the complaint in this case is "not clear as to what amount of revenues" Whole Foods improperly recognized, nor does the complaint "identify specific transactions in which there was improper revenue recognition and the materiality of such transactions." *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 853 (N.D. Tex. 2005); *see also In re Daou Sys., Inc.*, 411 F.3d 1006, 1017 (9th Cir. 2005) (quoting *Gross v. Summa Four,*

[8] The court can surmise the Retirement System's theory to be that because at least some Whole Foods items were sold at prices that were set in reliance on inaccurate weights and measures, the difference between what Whole Foods charged and what it should have charged rendered Whole Foods' factually true statements of its sales and earnings misleading. However, the Retirement System neither makes this theory explicit in its complaint nor presents any factual allegations that would support such a theory.

*Inc.*, 93 F.3d 987, 996 (1st Cir. 1996), *superseded by statute on other grounds*) (allegation of revenue overstatement in violation of GAAP insufficient where plaintiff "has not alleged the amount of the putative overstatement or the net effect it had on the company's earnings"). Instead, the complaint conclusorily alleges that Whole Foods' weights-and-measures issues resulted in "improperly inflated revenues" and "overstatements of net income, [diluted earnings per share] and gross profits." With respect to materiality, the complaint relies on the fact that "two thirds of the Company's sales" come from prepackaged perishable items while failing to quantify the proportion of those sales that were supposedly inflated. These allegations, which do not identify specific transactions or amounts by which any results were overstated, cannot satisfy the requirement of particularity in pleading materially false or misleading statements.[9] *See Daou*, 411 F.3d at 1017 (quoting *Gross*, 93 F.3d at 996) ("A general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation to satisfy Rule 9(b).").

Finally, the complaint fails to state a claim for a Section 10(b) violation based on SEC Regulation S-K Item 303. "Item 303 of Regulation S-K imposes disclosure requirements on companies filing SEC-mandated reports, including quarterly Form 10-Q reports." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). These requirements "include the obligation to '[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." *Id.* (quoting 17 C.F.R. § 229.303(a)(3)(ii)). There is a circuit split on the question

[9] In support of its GAAP allegations, the Retirement System attempts to rely on *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249 (5th Cir. 2005), in which the Fifth Circuit concluded that the plaintiffs had stated a claim of fraud based on revenue overstatement. *Id.* at 257. *Barrie* is distinguishable, however, as the complaint in that case specifically alleged that the defendant "admitted that it had improperly recognized $18.3 million in its Form 10-Q report filed on July 14, 2000." *Id.* at 256.

of whether a failure to make a required Item 303 disclosure in a 10-Q filing can serve as an "omission" giving rise to a Section 10(b) securities-fraud claim. The Ninth Circuit has held that in light of the significant differences in materiality standards under the two rules and the much broader scope of Item 303, "Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5"; rather, "[s]uch a duty to disclose must be separately shown according to the principles" applicable to the latter provisions. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). The Second Circuit, in contrast, has determined that although the failure to make a required disclosure under Item 303 "is not by itself sufficient to state a claim for securities fraud" under Section 10(b), "a violation of Item 303's disclosure requirements can . . . sustain a claim under Section 10(b) and Rule 10b-5 if the allegedly omitted information satisfies [the Section 10(b)] test for materiality."[10] *Stratte-McClure*, 776 F.3d at 102–03.

The Fifth Circuit has not spoken to the relationship between Item 303 and Section 10(b); however, at least one district court in the circuit has aligned with the Ninth Circuit in concluding that "Item 303 does not establish a duty to disclose that may give rise to liability under § 10(b)." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 632 n.63 (S.D. Tex. 2003). This court is persuaded by the Ninth Circuit's reasoning in *NVIDIA* that "for purposes of Section 10(b) and Rule 10b-5, material information need not be disclosed unless omission of that information would cause other information that is disclosed to be misleading." *NVIDIA*, 768 F.3d at 1056 (citing *Matrixx*, 563 U.S. at 43). A plaintiff thus "cannot seek to bring an action under Rule 10b-5 in the guise of an Item 303 violation when the same underlying alleged omissions are not sufficient to state a Rule 10b-5 violation." *Ash v. PowerSecure Intern., Inc.*,

---

[10] Notably, both the Second and Ninth Circuits claim that an earlier Third Circuit opinion by then-Judge Alito, which held that a violation of Item 303 "does not automatically give rise to a material omission under Rule 10b-5," supports their position. *See Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000).

No 4:14-CV-92-D, 2015 WL 5444741, at *11 (E.D.N.C. Sept. 15, 2015). "Item 303 is not a magic black box in which inadequate allegations under Rule 10b-5 are transformed, by means of broader and different SEC regulations, into adequate allegations under Rule 10b-5." *Id.*

The court thus concludes that the Retirement System's allegations of material omissions, reframed as Item 303 violations, are insufficient.[11]

*B. Scienter*

The complaint also fails to adequately allege scienter with respect to each defendant. The Reform Act requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). At minimum, this requirement impels a plaintiff to plead particular facts creating a "cogent and compelling" inference that the defendant acted with an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)). "Severe recklessness is 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care . . . .'" *Shaw Group*, 537 F.3d at 533 (quoting *Rosenzweig*, 332 F.3d at 866).

The Fifth Circuit has rejected the "group pleading" approach to scienter. *Id.* at 533. This means that "[i]t is insufficient to impute to each defendant a kind of collective knowledge of all the corporation's officers and employees acquired in their employment." *Carlton*, 2016 WL

[11] The court notes that even if Item 303 did create a duty to disclose for purposes of Section 10(b), the Retirement System's allegations would be insufficient. *See Lions Gate*, 2016 WL 297722, at *14 (existence of investigation and settlement not sufficient to allege Item 303 materiality where complaint "[did] not allege that it was reasonably likely that the . . . settlement could have been much higher than the relatively immaterial amount of $7.5 million").

2346943, at *13 (citing *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009)). Rather, "plaintiffs pleading fraud claims against individuals under § 10(b) and Rule 10b-5 [must] distinguish among the defendants and allege each one's role, intent, and knowledge." *Id.* The court, in turn, must "look to the state of mind of the individual corporate official who allegedly made, approved, or issued [each] statement at issue, or who furnished information or language to include in the statement." *Id.* In other words, "allegations claimed to show scienter on each defendant's part must be analyzed individually to determine whether the complaint sufficiently pleads scienter as to that defendant." *Id.*

In considering whether the complaint establishes a strong inference that each named defendant acted with the requisite state of mind, factual allegations should be "evaluated collectively, not in isolation." *Dawes*, 975 F. Supp. 2d at 689. Furthermore, a court assessing the sufficiency of scienter allegations must "take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Owens*, 789 F.3d at 536 (quoting *Shaw Group*, 537 F.3d at 533). A complaint will survive only if the inference of scienter is "at least as compelling as [any] opposing inference that the defendant did not know of the fraud or was merely negligent." *Id.*

Here, the Retirement System's allegations of scienter are insufficient to meet these standards. First, because the complaint does not adequately identify any false or misleading statements, an inference of fraudulent intent or recklessness in making such statements is necessarily lacking. Even assuming that the statements set forth in the complaint could be viewed as actionably false or misleading, there are no specific factual allegations from which to draw an inference that any particular defendant knew of or recklessly disregarded that falsity; instead, the complaint largely relies on impermissible group pleading. For instance, one of the

Retirement System's primary contentions is that at the time many of the statements about price competitiveness were made, "Whole Foods" had "already entered into a tolling agreement" with the State of California regarding its investigation into the company's labeling and weighing practices. Yet the complaint fails to identify which, if any, individual defendant knew about the agreement or the investigation itself, instead relying on the assumption that each defendant's senior position within the company made him or her automatically aware of such information. Likewise, to show that each individual defendant knew about weighing and labeling issues in New York, the complaint relies principally on post hoc statements that "the company" had been working with the city to address its concerns. In other words, the complaint's allegations of scienter boil down to an assumption that each individual defendant must have known about pervasive labeling and weighing problems—and therefore the falsity of statements about pricing and transparency made by other defendants—because of his or her position within the company. As the Fifth Circuit has made clear, however, "normally an officer's position with a company does not suffice to create an inference of scienter."[12] *Nathenson v. Zonagen*, 267 F.3d 400, 424 (5th Cir. 2001).

The complaint's failure to set forth an allegation of motive is also significant. "In the Fifth Circuit, the absence of motive allegations is a factor in determining whether the complaint adequately pleads scienter." *Dawes*, 975 F. Supp. 2d at 690. Although a complaint may establish a strong inference of scienter without motive allegations, "[w]here, as here, the plaintiff has not alleged a clear motive for the alleged misstatements or omissions, the strength of its circumstantial evidence of scienter must be correspondingly greater." *R2 Investments*, 401 F.3d at 644. The Retirement System's allegations suggest, at most, that someone at Whole Foods

[12] The "limited exception" to this general rule in cases involving very small companies is inapplicable here. *See Dawes*, 975 F. Supp. 2d at 699.

knew about the California and New York investigations before those investigations culminated in settlements. But in the absence of any allegation suggesting a "motive for the alleged misstatements or omissions" with respect to each individual defendant and in connection with the particular statements that he or she made, the limited factual allegations about the *company's* involvement in the investigations do not meaningfully contribute to an inference of any one defendant's scienter.

Finally, the Sarbanes-Oxley certifications of Mackey, Robb, and Flanagan do nothing to strengthen the inference of scienter. "[C]onsidering [Sarbanes-Oxley] certifications as part of the scienter analysis is proper only 'if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions.'" *Dawes*, 975 F. Supp. 2d at 693 (quoting *Cent. Laborers' Pension Fund v. Integrated Elec. Serv. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007)). The Retirement System has failed to allege specific facts in support of its theory that Whole Foods' earnings were overstated. For the same reason, allegations concerning "glaring accounting irregularities or other 'red flags'" are lacking. Thus, the certifications here do not present a basis to infer scienter on the part of Mackey, Robb, or Flanagan.

Viewed collectively, the factual allegations that the Retirement System relies on to support an inference of scienter as to each individual defendant suggest that some unspecified executives at Whole Foods knew about the New York and California investigations at the time particular individual defendants made some of the statements alleged to be false or misleading. However, the complaint makes no attempt to establish a connection between each statement and the knowledge of the particular defendant making it. For instance, the complaint attributes only

one allegedly misleading statement to Gallo—the affirmation that Whole Foods was "really focused on being really competitive with our prices"—and there are no factual allegations to even circumstantially support the inference that Gallo knew about weights-and-measures issues or the California investigation at the time he made that statement.

The court accordingly concludes that the allegations in the complaint do not give rise to a cogent and compelling inference that the individual defendants acted with the requisite scienter. For this reason, the complaint also does not give rise to a cogent and compelling inference that Whole Foods itself acted with the requisite scienter. *See Southland*, 365 F.3d at 366–67 (recognizing that defendant corporation can only have requisite scienter if individual officer making statement has scienter).

*C. Loss Causation*

Defendants argue that the Retirement System has also failed to adequately plead loss causation. As the complaint notes, Whole Foods' Forms 10-K filed during the class period cautioned that "isolated incidents" could "erode trust and confidence, particularly if" they resulted "in adverse publicity, governmental investigations or litigation . . . ." Defendants assert that any decline in stock price was attributable to the actualization of this disclosed risk and not to a revelation that Defendants defrauded investors.

To plead loss causation, "the plaintiff must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm." *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014) (quoting *Lormand*, 565 F.3d at 255). "For a complaint to adequately plead this requirement, it need only set forth 'a short and plain statement of the claim[']" containing sufficient factual allegations to make the

existence of loss causation plausible. *Id.* (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).

In support of loss causation, the complaint in this case alleges that Whole Foods' stock price fell after Robb and Mackey informed investors that the New York City Department of Consumer Affairs' press release about the company's weights-and-measures issues had caused sales to slow. The Retirement System argues this press release, coupled with public statements made by the individual defendants, constituted a "corrective disclosure" that revealed the truth about Whole Foods' pricing practices and directly produced the stock price decline, thereby establishing loss causation. However, plaintiffs pleading loss causation "are required to allege the truth that emerged was 'related to' or 'relevant to' the defendants' fraud and earlier misstatements." *Amedisys*, 769 F.3d at 321 (quoting *Lormand*, 565 F.3d at 255–56). The Retirement System has failed to allege how any of Defendants' statements were false or misleading in light of the weights-and-measures issues in California and New York. As such, the complaint does not allege that the "truth" of mislabeling and overcharging in New York City stores made "actionable fraud more probable than it would be without that alleged fact. . . ." *Id.* In short, "[i]n the absence of a false representation, there can be no revelation of falsity to the market." *Curry v. Yelp, Inc.*, No. 14-CV-03547-JST, 2015 WL 1849037, at *10 (N.D. Cal. Apr. 21, 2015).

The court accordingly concludes that the complaint in this case fails to adequately allege loss causation.

*D. Section 20(a) Claim*

The Retirement System also alleges control-person liability against the individual defendants under Section 20(a) of the Exchange Act. *See* 15 U.S.C. § 78t. "Control person

liability is secondary only and cannot exist in the absence of a primary violation." *Shaw Group*, 537 F.3d at 545 (alteration in original) (quoting *Southland*, 365 F.3d at 383). Because the Retirement System has not adequately pleaded Section 10(b) liability, there is no basis on which to establish a Section 20(a) claim.

*E. Leave to Amend*

Even if the court assumes that Whole Foods did have a widespread practice of over-weighing and mislabeling its prepackaged foods in violation of consumer-protection laws in this case, the complaint does not allege sufficiently that this practice also makes Whole Foods and the individual defendants liable for securities fraud. If these allegations were sufficient, "then every individual who purchased the stock of a company that was later discovered to have broken any law could theoretically sue for fraud." *Strougo*, 105 F. Supp. 3d at 345 (quoting *Gusinsky v. Barclays PLC*, 944 F. Supp. 2d 279, 289 (S.D.N.Y. 2013), *vacated in part on other grounds sub nom. Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2015)). A major goal of the Reform Act was to prevent such "perceived abuses of the § 10(b) private action" by ensuring that plaintiffs meet heightened pleading requirements. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007). The Retirement System has failed to satisfy those requirements here. Nevertheless, the Retirement System states in its response to Defendants' motion that "[i]f the Court is inclined to grant any part of [the] Motion, plaintiff respectfully requests that any such order be without prejudice to plaintiff's ability to seek to cure any defects via amendment."

Ordinarily, district courts "afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable . . . ." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). As

such, the Retirement System should have an opportunity to address the deficiencies identified in this order through amendment if it can. The court will accordingly grant Defendants' motion to dismiss without prejudice.

## IV. CONCLUSION

**IT IS ORDERED** that Defendants' Motion to Dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws (Clerk's Doc. No. 57) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FINALLY ORDERED** that Plaintiff shall file an amended complaint in accordance with the terms of this order **on or before September 19, 2016**. Should Plaintiff fail to file a compliant amended complaint by that date, all claims will be dismissed with prejudice.

**SIGNED** this 19th day of August, 2016.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE