UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| YOCHANAN MARKMAN, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 1:15-cv-00681-LY |
| | § | CLASS ACTION |
| Plaintiff, | § | |
| | § | SECOND AMENDED CLASS ACTION |
| vs. | § | COMPLAINT FOR VIOLATION OF THE |
| | § | FEDERAL SECURITIES LAWS |
| WHOLE FOODS MARKET, INC., et al., | § | |
| | § | DEMAND FOR JURY TRIAL |
| Defendants. | § | |
| | § | |

1187606_1

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................................2

BACKGROUND AND SUMMARY .....................................................................................3

JURISDICTION AND VENUE ..........................................................................................13

PARTIES ..................................................................................................................... 13

CONTROL PERSONS ......................................................................................................17

DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS
    DURING THE CLASS PERIOD ...........................................................................18

    Whole Foods Is Sued by the State of California for Overcharging Customers and
        Is Fined and Permanently Enjoined from Weights and Measures
        Violations in California.................................................................................32

    Albany, New York Weights and Measures Violations; Company Launches
        "Values Matter" Campaign..........................................................................37

    Additional Weights and Measures Violations .................................................41

    New York City DCA Reveals Its Investigation of Whole Foods; Stock Price
        Remains Artificially Inflated .......................................................................47

    The Impact of Defendants' Systemic Overcharging of Customers on Whole
        Foods' Financial Condition Is Revealed....................................................51

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ARE MATERIAL AND
    OMITTED MATERIAL INFORMATION...........................................................56

DEFENDANTS' PURPORTED RISK DISCLOSURES ARE INSUFFICIENT TO
    SHIELD THEM FROM LIABILITY FOR THEIR FALSE AND MISLEADING
    STATEMENTS AND OMISSIONS .....................................................................58

WHOLE FOODS' FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED
    IN VIOLATION OF GAAP AND SEC DISCLOSURE RULES ......................59

LOSS CAUSATION/ECONOMIC LOSS .........................................................................67

APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET..........69

CLASS ACTION ALLEGATIONS ..................................................................................70

COUNT I .........................................................................................................................72

COUNT II ........................................................................................................................74

PRAYER FOR RELIEF ...................................................................................................76

JURY DEMAND ..............................................................................................................76

## INTRODUCTION

1.     Lead Plaintiff Employees' Retirement System of the State of Hawaii ("plaintiff" or the "Retirement System"), alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through its attorneys, which included, among other things, a review of Whole Foods Market, Inc.'s ("Whole Foods" or the "Company") United States Securities and Exchange Commission ("SEC") filings, Company releases, conference calls, public statements issued by defendants, the Company's website and other internet sources, media reports, analyst reports and industry reports. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.     The Second Amended Complaint for Violations of the Federal Securities Laws ("SAC") details facts adequately demonstrating that Whole Foods and the Individual Defendants, knew or recklessly disregarded that the Company, from New York to California, engaged in systematic overpricing of pre-packaged foods rendering its reported financial statements, including revenue and earnings, materially false and misleading as the Company recognized revenue that it could not establish was in fact "earned" under the applicable accounting rules. *See* ¶¶124-138. In addition, the known or recklessly disregarded conduct alleged herein rendered defendants' other statements during the Class Period about, for example, the Company's commitment to high standards of "transparency and accuracy in everything we do," materially false and misleading. *See* ¶¶52-95.

3.     The SAC also specifically addresses pleading deficiencies the Court identified in its August 19, 2016 Order on Motion to Dismiss (Dkt. No. 63) ("August 19 Order"). First, for example, the SAC provides additional facts concerning the amount of revenue that would have been impacted by the Company's overpricing of pre-packaged foods in the Company's New York City market. *See* ¶¶124-138; August 19 Order at 19. The SAC details, and makes more explicit, based in part upon the sworn affidavits of a Whole Foods Senior Data Mining Analyst, the number of unit sales, sales transactions and the amount of revenue potentially affected by the overpricing found by the New York City Department of Consumer Affairs ("DCA"). Extrapolating from those sworn facts, the

- 1 -

SAC estimates the overstatement of revenue and earnings using the rate of over pricing (89%) found by the DCA.

4.      Second, the SAC more clearly identifies each and every alleged false statement, including the speaker of the alleged misrepresentation, demonstrating that plaintiff is not relying on the "group pleading" doctrine.  *See* August 19 Order at 23; *see also* ¶¶52-95.

5.      Third, the SAC also clarifies plaintiff's allegations concerning the alleged falsity of John P. Mackey ("Mackey"), Walter E. Robb ("Robb") and Glenda Jane Flanagan's ("Flanagan") certifications made pursuant to THE Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") §§302 and 906 to specify that assertions therein, regarding both the Company's internal controls and the Company's disclosure controls were materially false and misleading.  *See*, *e.g.*, ¶¶55, 56(d)-(e); *see also* August 19 Order at 18 n.7.

6.      Finally, the SAC provides additional clarification regarding the materiality of the Company's misrepresentations and establishes that a reasonable investor would rely upon such representations in making an investment decision, as well as demonstrating that the Company itself found transparency and pricing accuracy, and thus its representations regarding the same, to be integral to the Company's core value propositions.  *See* August 19 Order at 13-14; *see* ¶¶114-121. In fact, Whole Foods explicitly acknowledged that transparency was core to the Company and core to the way that customers viewed the Company, stating: "Clear and transparent pricing is integral to how we operate."  ¶104.   Moreover, the disclosure of the impact of the overpricing on the Company's financial condition caused a significant stock price decline.  The SAC plainly alleges that to date, more than a year later, the Company's stock price has yet to recover, further supporting the materiality of the misrepresentations, the alleged misconduct and the disclosure of the truth.

7.      Together, the allegations set forth herein, sufficiently allege violations of the Securities Exchange Act of 1934 ("Exchange Act") under the heightened pleading standard of the Private Securities Litigation Reform Act of 1995.

## NATURE OF THE ACTION

8.      This is a securities class action brought on behalf of purchasers of Whole Foods' common stock between July 31, 2013 and July 29, 2015, inclusive (the "Class Period"), against

Whole Foods, its co-founder and co-Chief Executive Officer ("CEO") Mackey, its other co-CEO Robb, its Chief Financial Officer ("CFO") Flanagan, its President and Chief Operating Officer ("COO") A.C. Gallo ("Gallo"), and its Executive Vice Presidents of Operations David Lannon ("Lannon") and Kenneth J. Meyer ("Meyer") for violating §10(b) and §20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## BACKGROUND AND SUMMARY

9.      Whole Foods describes itself as the world's leading retailer of natural and organic foods and America's first national "certified organic" grocer.  The Company's stated mission is to promote the vitality and well-being of all individuals by supplying the highest quality, most wholesome foods available.

10.      On the Company's website, in its annual stakeholders' report, and in quarterly conference calls, defendants regularly promoted Whole Foods' commitment to values, transparency and building customers' trust through, among other things, competitive pricing, as the key differentiators between the Company and its competition.  For example, during Cannacord Genuity's Global Growth Conference on August 14, 2012, defendant Robb emphatically stated that:

> [W]e see ourselves as being in somewhat of a leadership role in the supermarket industry and the food industry.  I think one of the ways we've been able to continue to create some separation from the competitors . . . has been to continue to set standards of transparency, accountability . . . .

11.      Similarly, as defendant Robb stated at the Goldman Sachs Global Retailing Conference on September 7, 2011:

> There's no question about it that by becoming relevant again on price, people have said, okay, I'm noticing that.  I'm coming back.  I'm trusting you.  And that is driving and building loyalty and basket and traffic.

12.      Defendants focused their remarks on pricing because the Company's prices have historically been markedly higher than competitors' prices.  Indeed, for more than two decades, Whole Foods has been pejoratively called "Whole Paycheck" and, as a Wells Fargo Securities analyst put it in November 2013, "price is the most important reason people don't shop [at Whole

- 3 -

Foods] or don't shop more often."  Moreover, as consumer demand for natural and organic foods has grown, more traditional retailers like Safeway, Kroger, and WalMart have increased their natural and organic food offerings, putting intense pressure on Whole Foods to compete on price.  Thus, before and during the Class Period, to remain competitive in light of the new entrants to the natural and organic food retailing industry, Whole Foods increased its efforts to reduce prices in an attempt to shed its "Whole Paycheck" moniker, including expanding its effort to cut prices on perishable items.  That effort included Whole Foods' investment of a substantial amount of capital in technology to monitor, control and adjust the prices of its items from its corporate headquarters.

13.     Defendants consistently equated "value" with lower, competitive pricing.  For example, in the 2013 Annual Stakeholders' Report, the Company stated:

**WE ARE FOCUSED ON BOTH VALUE AND VALUES**.

We continued to expand our value offerings across the store and narrowed the pricing gap versus our competitors on known value items to its narrowest margin yet.

14.     Similarly, in the June 13, 2012 conference call with analysts and investors, Mackey stated:

[W]e are always working value now.  We are very conscious of it.  We price against our competitors.  We know in every market what the prices our competitors have.

15.     In keeping with its focus on natural and organic foods, Whole Foods' sales mix is heavily weighted towards perishable products, including prepared foods, meat, seafood, cheeses and produce.  While perishables account for less than half the product mix at most other grocery stores, perishables comprise two thirds of the Company's sales.  One analyst observed that Whole Foods' emphasis on perishables (which are not branded), coupled with its relatively small offering of nationally-branded products, created a customer base that "focused on Whole Foods as the brand behind a majority of the products it sells."

- 4 -

16.     By the beginning of the Class Period, defendant Mackey publicly acknowledged the value of information collected through the use of its technology investments to facilitate pricing initiatives and remain competitive on pricing:

> [We have] developed our data team to the point now where we have such good information that we do a lot of experiments, which is really exciting.  And so we can try a lot of different pricing initiatives against different types of competitors, again, in different marketplaces, with different products, and see what happens, see what kind of elasticity there is in terms of the pricing versus pickup in sales and see what customers really want.

17.     Not only was Whole Foods (as well as its shareholders, analysts and customers) meticulously focused on its prices, its regulators were too.  As a retail grocer, Whole Foods is/was required to comply with weights and measures regulations setting forth the procedures and standards for measuring, weighing and labeling its packaged goods.  These general standards and procedures are set forth in the National Institute of Standards and Technology Handbook 133: Checking the Net Contents of Packaged Goods ("Handbook 133"), which has been adopted by New York, California, Texas and several other states.  Handbook 133 sets out a seven-step method for determining whether the net content of packaged goods is unlawfully less than the amount stated on the label.  It is not unlawful for a package to be overweight, *i.e.*, mislabeled in a way that benefits the consumer.

18.     With respect to its growth prospects leading up to the Class Period, Whole Foods began accelerating its new store openings, opening a record 10 stores during 1Q13, and was reportedly on pace to open 32-34 new stores during the year and approximately 33-38 stores in FY14.[1]  Indeed, in March 2013, defendant Robb confidently proclaimed the Company could "easily see the roadmap to 1,000 stores . . . without even breaking a sweat."  At the same time, however, the Company was under pressure to increase its return on invested capital ("ROIC"), which analysts recognized was key to the Company's long-term growth target.  As one analyst noted, "Strong ROIC

---

[1]     Whole Foods' fiscal quarters are abbreviated by quarter and year.  For example, 3Q13 represents the third quarter of fiscal year 2013.  Whole Foods' fiscal year ends the last Sunday in September.

= More Confidence in Achieving LT Store Growth Target," and while "[i]n the past, WFM might realize ROIC from new stores in the 7% range; today, the company is seeing ~14%, and there's opportunity to move it even higher."

19.     With that background and as alleged in detail herein, throughout the Class Period, defendants violated the federal securities laws by disseminating false and misleading statements, including material omissions, to the investing public concerning the state of the Company's current business condition and future financial prospects.  In particular, and in addition to financial results which were materially misstated due to overcharging customers for pre-packaged foods, the Company and the Individual Defendants asserted and repeatedly and falsely assured investors that Whole Foods' business was run with high standards and transparency including competitive product pricing that would drive traffic and revenue growth.  The following are examples of the false and misleading statements issued during the Class Period:

- ***Whole Foods Market has the highest standards in the supermarket industry*** . . . .

- ***The transparency that is going to continue*** . . . *that is where we are the leaders* . . . .

- ***[W]e know we're not other retailers – we're Whole Foods Market, and we take pride in setting higher standards*** . . . .

20.     As a result of defendants' materially false and misleading statements and omissions, the Company's stock price traded at artificially inflated prices throughout the Class Period.

21.     In truth, however, each of the above statements and omissions including those concerning the Company's quarterly and annual reported financial results, pricing accuracy and transparency and the adequacy of the Company's internal controls (which defendants certified pursuant to §302 and §906 of Sarbanes-Oxley, SEC Rule 13a-14(a), and 18 U.S.C. §1350), were materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants:

(a)      The Company's reported financial results were driven in part by systemic and pervasive overpricing and mispricing of pre-packaged foods caused by routine tare weight errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

(b)      Whole Foods routinely overcharged customers and engaged in known and preventable weights and measures violations on its pre-packaged foods, which defendants acknowledged could negatively (and materially) impact the Company's reputation and customers' trust – and consequently the Company's sales, revenue, earnings and margins (and stock price);

(c)      Whole Foods was then the subject of an ongoing, statewide investigation in California – and later, New York City – of substantial and repeated weights and measures violations, including its failure to deduct the weight of containers, which would later result in significant fines, a permanent injunction and forced changes to its business practices; and

(d)      Whole Foods lacked sufficient internal controls over financial reporting to prevent the Company from systemically overstating the weight of pre-packaged foods and overcharging customers in at least California and New York, two of the Company's largest markets, which in turn resulted in both a qualitative and quantitative material overstatement of revenues and earnings in violation of the United States generally accepted accounting principles ("GAAP"). *See* ¶¶124-138.

22.     In June 2014, the State of California, Whole Foods' largest market, levied an $800,000 fine on the Company for alleged violations of the California Business and Professions Code.  Specifically, California alleged, among other things, that Whole Foods violated California's prohibition on unfair and deceptive business practices by making untrue or misleading statements constituting false advertising, selling an item in less quantity than it was represented and selling a pre-packaged commodity in less weight than represented.  The Company entered into a permanent

injunction with the State of California, paid fines and agreed to implement a compliance program to resolve the claims. Ex. 1, attached hereto.[2]

23.     Thereafter, the Company continued to make false and misleading statements and omissions concerning the adequacy of its internal and disclosure controls, financial results, overall quality, value and business standards, causing the Company's share price to trade at artificially inflated levels:

- We continue to see unit lift from the lower produce pricing . . . more competitive produce pricing will *greatly benefit our overall value perception*.

- But we also know it's *important that we be relevant on price*.  We know that also *values matter but value matters* too and so we have made investments in price in selected markets . . . .

24.     On June 24, 2015, the DCA announced it had uncovered "*widespread* problem[s]" of "[*s*]*ystemic* [o]vercharging for [p]re-[p]ackaged [f]oods" at Whole Foods' eight New York City locations:[3]

- DCA tested packages of 80 different types of pre-packaged products and found *all of the products had packages with mislabeled weights*.

- *89 percent of the packages tested did not meet the federal standard for the maximum amount that an individual package can deviate from the actual weight* . . . .

- DCA's findings point to a *systematic problem with how products packaged for sale at Whole Foods are weighed and labeled*.

- [T]his is *the worst case of mislabeling they have seen in their careers* . . . .

25.     On June 29, 2015, defendants Robb and Mackey posted a video to the Company's website to admit and "own" the pricing and mislabeling issues identified by the New York City DCA:

---

[2]     *People of the State of Cal. v. Whole Foods Mkt. Cal., Inc*., No. SC122679, Final Judgment and Permanent Injunction Pursuant to Stipulation (Cal. Super. Ct. L.A. Cty. June 18, 2014) (the "California Stipulation").

[3]     A ninth Whole Foods location opened after DCA's investigation was conducted.

Hi.  I'm Walter Robb, and together with John Mackey we serve as the co-CEO's of Whole Foods Market and *we want to talk directly with you this morning about certain pricing issues you may have heard about* in our New York City stores.  *Straight up, we made some mistakes*.  *We want to own that* and tell you what we're doing about it.

26.     On July 2, 2015, SunTrust Robinson Humphrey analysts issued a report titled "WFM Reacts to 'Thumb-on-Scale' Charges":

> **Whole Foods Market, Inc. is in the news this morning . . .** *with a surprising apology for inaccurate pricing in its NYC stores*.  This follows recent charges by NYC's Department of Consumer Affairs that WFM was overcharging customers based on weight discrepancies.
>
> *After initially denying the claims, management decided to* "*come clean*," presumably after conducting an internal investigation.  The incorrect charges, according to the company, went "both ways" and only took place in a small portion of the assortment.  Along with the apology, management promised to tighten procedures chain-wide and follow up with periodic (and published) audits.[4]

(Emphasis and alteration in original.)

27.     Then, on July 29, 2015, after the market closed, Whole Foods issued a press release announcing its financial and operating results for the third quarter ended July 5, 2015, which fell far short of analysts' revenue and earnings expectations, reporting adjusted 3Q15 earnings per share ("EPS") of $0.43 on $3.63 billion of revenue.  The Company also reported a shocking decline in comparable store sales growth admittedly due to disclosures of the Company's overpricing and mislabeling violations.[5]  During a conference call with analysts and investors to discuss the 3Q15 results, defendants directly attributed Whole Foods' lower-than-expected quarterly financial results

---

[4]     To date, it is not clear that Whole Foods has published any such pricing audits.

[5]     Whole Foods, in its 2013 Form 10-K, defined and determined comparable store sales ("comps") in the following way:

> Sales of a store are deemed to be comparable commencing in the fifty-third full week after the store was opened.  Stores acquired in purchase acquisitions enter the comparable store base effective the fifty-third full week following the date of merger.  Identical store sales exclude sales from relocated and remodeled stores with square footage changes greater than 20% from the comparable calculation to reduce the impact of square footage changes on the comparison.  Stores closed for eight or more days are excluded from the comparable and identical store base from the first fiscal week of closure until re-opened for a full fiscal week.  Comparable and identical sales growth is calculated on a same-calendar-week to same-calendar-week basis.

to the impact of the disclosure that the Company had systemically overcharged its customers, stating that the news had a "significant impact on our sales" and that the impact was "felt across the whole country:"

- ***Comps dropped sharply in week 11, after our New York City weights and measures audit received national media attention*** . . . .

- ***And clearly it affected the comps*** . . . ***But by any measure, it had significant impact on our sales***.

- ***The impact was really felt across the whole country, not in New York City***.

28.     As a result of these disclosures, Whole Foods stock price declined $4.74 per share, or over 11%, to close at $36.08 per share on July 30, 2015, on extremely high volume of more than 35 million shares (compared to only 8 million shares traded on July 29, 2015).

29.     On July 30, 2015, SunTrust Robinson Humphrey published a reported titled, "WFM 3Q Comp Light; Reset Numbers; Buy" and explained that the disappointing financial results and the concomitant precipitous drop in Whole Foods' stock price was indeed caused by the widespread overcharging in New York:

> ***The market treated this [earnings] news rather harshly***, sending the shares down 10%-11% in after market trading.  We understand the frustration.  ***A big portion of the shortfall evidently came from the pricing "scandal" in NYC in June . . . this factor alone seemed to cause comps to decelerate from 2.6% (the QTD run rate at that point) to 0.4% in the last two weeks of the period***.

(Alteration in original.)

30.     Whole Foods' customer traffic, sales and revenue continued to lag after the July 29, 2015 earnings announcement.  On November 4, 2015, the Company announced quarterly results for 4Q15, which spanned July 6, 2015 – just a week after the New York City DCA investigation was announced – through September 27, 2015, acknowledging the need to "[r]ebuild sales" and that comparable store sales on a constant currency basis had declined.  Defendant Robb stated that "[w]e recognize the need to move faster and go deeper to ***rebuild traffic and sales*** and create a solid

foundation for long-term profitable growth and are taking the necessary steps to better communicate our differentiation, improve our value perception, and fundamentally evolve our business."

31.     During a conference call later in the day on November 4, 2015, defendant Mackey outlined the Company's new nine-point plan to rebuild sales momentum and acknowledged "that we recognize we have our work cut out for us. We believe we are taking the necessary steps to regain our sales momentum, fundamentally evolve our business model, and produce the returns that the investment community expects from us, and that we expect from ourselves."  On this disclosure, the price of Whole Foods common stock declined $1.16 per share between November 3, 2015 and November 5, 2015 on very heavy trading volume.

32.     During a May 4, 2016 conference call with analysts and investors to discuss the Company's quarterly financial results, defendants noted Whole Foods was approaching the one-year anniversary of the DCA's disclosure, further acknowledging that those revelations "took a tremendous amount of sales from Whole Foods Market."

33.     The DCA's disclosure angered customers as well as investors.  One day after the DCA issued its press release revealing its findings of rampant overcharges in Whole Foods' New York City stores, two individuals who frequently shopped at Whole Foods brought suit in New York State Supreme Court (the "New York Litigation") alleging they had purchased overpriced, underweight pre-packaged food from Whole Foods stores in New York and that they were injured by their overpayment for those mislabeled products.  That suit was removed by defendants to the United States District Court for the Southern District of New York ("SDNY").[6]  In order to convince the SDNY court that the lawsuit was properly removed to federal court, *i.e.*, that the alleged damages exceeded $5 million, Whole Foods submitted two affidavits of Jeffrey Moll, a Senior Data Mining Analyst at Whole Foods, outlining in detail efforts by various Whole Foods employees to estimate the scope of the potential overcharging at issue in the New York Litigation (the "Moll affidavits").

---

[6]     *Bassolino v. Whole Foods Market Group, Inc.*, No. 1:15-cv-06046-PAE (S.D.N.Y.).

*See* Exs. 2-3 attached hereto.  In presenting these affidavits to the SDNY court, Whole Foods stated

that Moll's analysis was "very conservative." *See* Ex. 4 at 2 attached hereto.

34.     According to the Moll affidavits, Whole Foods sold over 16 million units of the same

products that the DCA found to be overpriced in the three-year period preceding the DCA's

disclosure, for net sales of over $117 million.  *See* Ex. 2, Ex. A; Ex. 3, Ex. A.

35.     Moll further explained that the basis of his estimates was the review of detailed

transaction data stored in Whole Foods' data warehouse.  Ex. 2, ¶2; Ex. 3, ¶2.  Those records,

according to Moll, were then compared by Whole Foods to the data in the notices of violation sheets

the DCA provided to Whole Foods detailing the products that were found to be overpriced.  Ex. 2,

¶¶5-6; Ex. 3, ¶¶3-4.  Whole Foods, through Moll's affidavits, represented to the SDNY court that it

had isolated those products that the plaintiffs in the New York Litigation purchased and that, based

on its own "very conservative analysis" and calculations and, it had overcharged customers in New

York by over $9 million for the three-year period if the plaintiffs' allegations were true.  Ex. 2, ¶¶5-

7; Ex. 3, ¶5; Ex. 4.  The SDNY court accepted Whole Foods' representations, including the Moll

affidavits, in finding that the Company had met its burden of showing that the potential damages in

that case exceeded $5 million.  Ex. 5, attached hereto.

36.     The admitted facts from the Moll affidavits can be fairly extrapolated to estimate the

impact of the overcharging on the Company's overall financial statements or, at a minimum, the

financial impact of the overpricing in the states in which regulators found widespread overpricing –

New York and California.  Because it was overcharging customers on its pre-packaged products,

Whole Foods had not "earned" or "realized" the full amount of its recognized revenues, and the

inaccurate weighing led to customer overcharges which inflated reported revenue in violation of

GAAP and SEC rules.  This GAAP violation of basic revenue recognition principles resulted in false

financial statements issued during the Class Period that materially overstated sales, gross profits, net

income and EPS.  *See* ¶¶124-138.

37.     Plaintiff, on behalf of the Class, hereby seeks to recover economic losses caused by the material misrepresentations and omissions set forth herein.

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa) as the claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

39.     Venue is proper pursuant to §27 of the Exchange Act, as many of the acts and conduct complained of herein occurred in this District.  Whole Foods maintains its headquarters in this District at 550 Bowie Street, Austin, Texas 78703.

40.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ stock market.

## PARTIES

41.     The Retirement System is a public retirement system based in Honolulu, Hawaii that provides retirement, disability, survivor, and other benefits to more than 115,000 members.  As detailed in the previously filed Certification incorporated herein by reference (Dkt. No. 14-1), the Retirement System purchased Whole Foods common stock at artificially inflated prices during the Class Period and suffered damages as a result of defendants' alleged misconduct.

42.     Defendant Whole Foods is a retailer of natural and organic foods and other grocery items that operates more than 430 stores in the United States, Canada, and the United Kingdom, averaging over seven million customer visits each week.  During the Class Period, the Company's

stock was listed and traded on the NASDAQ market, an efficient market, under the ticker WFM. There were at least 350 million shares of Whole Foods stock outstanding during the Class Period.[7]

43.     Defendant John P. Mackey is, and was during the Class Period, Whole Foods' co-CEO and a director of the Company.  Mackey founded Whole Foods in 1978 and served as CEO of the Company from 1980 until 2010, at which time he was named co-CEO.  As co-CEO, defendant Mackey spoke on Whole Foods' behalf in press releases, conference calls and SEC filings.  During the Class Period, Mackey reviewed, approved and signed Whole Foods' materially false and misleading SEC filings and certifications pursuant to §302 and §906 of Sarbanes-Oxley, SEC Rule 13a-14(a), and 18 U.S.C. §1350.  Specifically, Mackey signed and certified the Company's Forms 10-K filed with the SEC on November 22, 2013 and November 21, 2014 and the Company's 2013 and 2014 Forms 10-Q on Whole Foods' behalf.  Defendant Mackey also made materially false and misleading statements, or omitted material information, on conference calls held on November 6, 2013, May 6, 2014, July 30, 2014, and November 5, 2014, in a press release on May 6, 2015 and at Whole Foods' Investor Day on February 27, 2015.

        (a)     In addition to his controlling position at the Company, defendant Mackey has publicly expressed his personal disdain for regulations that govern commercial businesses, including Whole Foods, and characterized their purpose generally as being designed to "shackle business."[8]  According to Mackey, therefore, Whole Foods' business policy is to "ask for forgiveness" rather than "permission."[9]

        (b)     Mackey has also demonstrated a willingness to work in the shadows to advance investor interest in the Company through promotion of its virtues and denigration of its

---

[7]     Whole Foods conducted a 2-for-1 stock split on May 30, 2013.

[8]     Nick Gillespie and Todd Krainin, *Whole Foods' John Mackey: Why Intellectuals Hate Capitalism*, Reason.com (Aug. 12, 2015), https://reason.com/archives/2015/08/12/whole-foods-john-mackey-capitalism/print.

[9]     Evan Smith, *John Mackey*, Texas Monthly (Mar. 2005), http://www.texasmonthly.com/the-culture/john-mackey/.

competitors.  Beginning in January 1999 and continuing until August 2006, Mackey, hiding his identity behind the pseudonym "rahodeb" – an anagram of Deborah, his wife's name – posted over 1,200 entries on a Yahoo! Finance message board dedicated to Whole Foods' stock.  Mackey also commented on the Yahoo! Finance message board for Wild Oats, a then-competitor of Whole Foods.  On the message boards, Mackey promoted Whole Foods and the value of its stock and disparaged competitor Wild Oats.  For example, "rahodeb" posted in early 2005 that Wild Oats' management "clearly doesn't know what it is doing. . . .  OATS has no value and no future."  In April 2005, he posted "Whole Foods is undervalued and OATS very much overvalued.  There is no value in OATS, its run is near the end, stock could be flat to negative for years, the fundamentals need to catch up, bad company, risky investment."  The posts were revealed in a United States Federal Trade Commission lawsuit to block Whole Foods' takeover of Wild Oats.

(c)     In January 2005, Mackey, as "rahodeb," posted that Whole Foods had no interest or financial reason to buy Wild Oats.  Whole Foods announced its purchase of Wild Oats approximately two years later.  Mackey also rejected other commenters' accusations that he in fact was "rahodeb," claiming falsely at one point that "rahodeb" was President George W. Bush.  After Mackey's surreptitious posts were publicly revealed, Mackey, in an attempt to justify his actions, claimed he wanted to "express [his] viewpoints" in response to Whole Foods' online detractors.  But, even this explanation wasn't fully "transparent," as Mackey acknowledged that "'[t]he views articulated by rahodeb sometimes represent what I actually believed and sometimes they didn't.'"

44.     Defendant Walter E. Robb joined Whole Foods in 1991 and has served as co-CEO, along with Mackey, since 2010.  During the Class Period, Robb was co-CEO and a director of the Company.  As co-CEO, defendant Robb spoke on Whole Foods' behalf in releases, conference calls and SEC filings.  During the Class Period, Robb reviewed, approved and signed Whole Foods' materially false and misleading SEC filings and certifications pursuant to §302 and §906 of Sarbanes-Oxley, SEC Rule 13a-14(a), and 18 U.S.C. §1350.  Specifically, Robb signed and certified

- 15 -

the Company's Forms 10-K filed with the SEC on November 22, 2013 and November 21, 2014 and the Company's 2013 and 2014 Forms 10-Q on Whole Foods' behalf.  Defendant Robb also made materially false and misleading statements, or omitted material information, on conference calls held on February 12, 2014, May 6, 2014, July 30, 2014, and February 11, 2015, in press releases on July 30, 2014 and February 11, 2015, at an investor conference on March 12, 2014, and at Whole Foods' Investor Day on February 27, 2015.

45.     Defendant Glenda Jane Flanagan is, and was during the Class Period, Whole Foods' CFO and Executive Vice President.  Defendant Flanagan has been CFO and Executive Vice President of Whole Foods since 1988 and the Company states she "has played a major role in the development of the company."  As CFO, defendant Flanagan spoke on Whole Foods' behalf in releases, conference calls and SEC filings.  During the Class Period, Flanagan reviewed, approved and signed Whole Foods' materially false and misleading SEC filings and certifications pursuant to §302 and §906 of Sarbanes-Oxley, SEC Rule 13a-14(a), and 18 U.S.C. §1350.  Specifically, Flanagan signed and certified the Company's Forms 10-K filed with the SEC on November 22, 2013 and November 21, 2014 and the Company's 2013 and 2014 Forms 10-Q on Whole Foods' behalf.

46.     Defendant A.C. Gallo is, and was during the Class Period, Whole Foods' President and COO.  Whole Foods states that defendant Gallo is "deeply involved" in product sourcing and quality standards initiatives.  Defendant Gallo has been President and COO since 2010 and has held a variety of positions at Whole Foods.  As COO, defendant Gallo spoke on Whole Foods' behalf in releases and conference calls.  Specifically, defendant Gallo made materially false and misleading statements, or omitted material information, on a conference call held on May 6, 2015.

47.     Defendant David Lannon is, and was during the Class Period, Executive Vice President of Operations for Whole Foods.  Defendant Lannon has been Executive Vice President of Operations since 2012 and has held a variety of positions at Whole Foods, including president of the Northern California region and Northern Nevada.  As Executive Vice President of Operations, defendant Lannon spoke on Whole Foods' behalf in releases and conference calls.  Specifically, defendant Lannon made materially false and misleading statements, or omitted material information, on conference calls held on February 12, 2014 and November 5, 2014.

48.     Defendant Kenneth J. Meyer is, and was during the Class Period, Executive Vice President of Operations for Whole Foods.  Whole Foods states that his responsibilities include overseeing day-to-day operations, development, design and innovations in existing stores and stores in the pipeline.  Defendant Meyer has been Executive Vice President of Operations since 2012 and has held a variety of positions at Whole Foods.  As Executive Vice President of Operations, defendant Meyer spoke on Whole Foods' behalf in releases and conference calls.  Specifically, defendant Meyer made materially false and misleading statements, or omitted material information, on a conference call held on July 31, 2013.

## CONTROL PERSONS

49.     Defendants Mackey, Robb, Flanagan, Gallo, Lannon, and Meyer are collectively referred to herein as the "Individual Defendants."  In 2010, an article titled "At Whole Foods, team management goes all the way to the top," reported that defendants Mackey, Robb, Flanagan and Gallo were "[d]ubbed the 'E-team' by employees [and] the group is so close that its members regularly take vacations together."  The article continued noting that the "tightknit team" has "functioned as a sort of CEO committee, collectively making decisions on strategy, finances, and other company matters."  The same article also quoted defendant Flanagan who stated, "it's extremely rare for any of us to make a decision of any consequence without consulting the full team."  While the Individual Defendants are sometimes referred to collectively herein if they all jointly participated in an event or statement and/or are alleged to have had the requisite scienter, plaintiff is not relying on the group pleading doctrine.

50.     As the senior-most executive officers and/or directors of Whole Foods, the Individual Defendants were in possession of and privy to confidential and proprietary information concerning Whole Foods, its operations, finances, financial condition, and present and future business prospects before and throughout the Class Period.  Because of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of Whole Foods' quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading before or shortly after their issuance and had the

ability and opportunity to prevent their issuance or cause them to be corrected.  As a result of their possession of and power to control such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

51.    As senior executive officers and controlling persons of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act during the Class Period, and was actively traded on the NASDAQ and governed by the federal securities laws during the Class Period, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding Whole Foods' operations, business and financial statements and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Whole Foods stock would be based upon truthful and accurate information.  Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

52.    <u>False and Misleading Statement.</u>  On July 31, 2013, Whole Foods issued a press release announcing its third quarter fiscal 2013 financial results, reporting net income of $142 million, or $0.38 diluted EPS, sales of over $3 billion, gross profit of over $1.1 billion and comps of 7.5%.  The release stated in part that "gross profit increased 61 basis points to 36.6% of sales driven by improvements in cost of goods sold and occupancy costs as a percentage of sales."  The release went on to state that Whole Foods' "'outstanding operational performance is funding our growth, and our new stores are creating a cycle of innovation across the company.'"

53.    <u>False and Misleading Statement.</u>  On the same day, Whole Foods hosted a conference call for analysts and investors attended by defendants Robb, Meyer, Mackey and Lannon.  During that call, defendant Meyer expressed pride in the Company's competitive pricing:

*We don't have to be ashamed compared to any other competitor for the exact same items we have great prices, and we're proud to show you about it and show it in our stores.*

54.     <u>False and Misleading Statement.</u>  On August 9, 2013, Whole Foods filed its quarterly report on Form 10-Q with the SEC for the period ended July 7, 2013, repeating the false financial results reported in the July 31, 2013 press release and conference call, which defendants stated were prepared in accordance with GAAP.  In addition, during the 3Q13 conference call with analysts and investors, defendant Robb stated, "we remain committed to . . . improving our relative price positioning."

55.     <u>False and Misleading Statement.</u>  The 3Q13 Form 10-Q was signed by defendant Flanagan and certified pursuant to Sarbanes-Oxley by defendants Mackey, Robb and Flanagan, whose certifications stated:

1.     I have reviewed this Quarterly Report on Form 10-Q of Whole Foods Market, Inc.;

2.     Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact*** . . . .;

3.     Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition*** . . . .;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.     Designed such disclosure controls and procedures . . . ***to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us*** . . . .;

b.     Designed such internal control over financial reporting . . . ***to provide reasonable assurance regarding the reliability of financial reporting*** . . . .;

                    *        *        *

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

56.   <u>Reasons Why Statements in ¶¶52-55 Were Knowingly False and Misleading</u>.  The statements set forth above concerning the Company's financial statements, pricing and adequacy of internal controls were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants Whole Foods, Mackey, Robb, Flanagan and Meyer:

(a)    The Company's reported financial results were driven in part by systemic and pervasive overpricing and mispricing of pre-packaged foods caused by routine tare weight errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

(b)    Whole Foods routinely overcharged customers and engaged in known and preventable weights and measures violations on its pre-packaged foods, which defendants acknowledged could negatively (and materially) impact the Company's reputation and customer trust – and consequently the Company's sales, revenue and margins (and stock price);

(c)    Whole Foods was then the subject of an ongoing, statewide investigation in California (with which it had already entered into a tolling agreement) of substantive and repeated weights and measures violations, including its failure to deduct the weight of containers, which would later result in significant fines, a permanent injunction and forced changes to its business practices.  It is implausible for defendants Whole Foods, Mackey, Robb, Flanagan[10] and Gallo to

---

[10]   Defendant Flanagan's last name used to be Chamberlain.

disclaim knowledge and/or awareness of the tolling agreement and Hempfling's involvement in the California and New York investigations or resolution of these investigations given the allegations in ¶49 and the fact that the Company previously agreed to a contractual provision in a Securities Purchase Agreement filed with the SEC on December 2, 2008 and stating that "'[k]nowledge' of the Company shall mean the actual knowledge of any of the following individuals: John Mackey, Chief Executive Officer; Glenda Chamberlain, Chief Financial Officer; A.C. Gallo, Co-President and Chief Operating Officer; Walter Robb, Co-President and Chief Operating Officer; James Sud, Executive Vice-President Growth and Business Development; and Roberta Lang, General Counsel";[11]

     (d)    Whole Foods' disclosure controls and procedures were either inadequately designed and insufficient to ensure that Whole Foods' rampant overcharging of customers for pre-packaged items was made known to Mackey, Robb and Flanagan, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that Mackey, Robb and Flanagan (and Whole Foods, by extension) were unaware of rampant overcharging and the investigation in California, but they failed to disclose these material facts or stop the overcharging;

     (e)    Whole Foods' internal controls over financial reporting were insufficient to prevent the Company from systemically overstating the weight of pre-packaged foods and overcharging customers and insufficient to ensure the reliability of the Company's financial reports as Whole Foods' financial results were inaccurate and in violation of GAAP and SEC rules due to the improper recognition of revenues not "earned," specifically, the revenues reported were in part the result of systemic overcharging;

     (f)    Whole Foods' financial statements did not fairly represent the financial condition because revenue and earnings were materially misstated.  The Company's undisclosed, widespread overcharging on pre-packaged foods gave the false impression that the Company was reporting stable and accurate financial results that generally reflected consumer demand for Whole

---

[11]    On its website, Whole Foods states that Ms. Lang "is Global Vice President and General Counsel of Whole Foods Market," and that "Roberta and her Legal Team oversee all legal affairs for the company."

Foods' products notwithstanding admittedly increased competition.  In truth, however, the financial statements, in addition to being materially overstated, failed to reflect consumer sentiment and tolerance for Whole Foods' pricing;

(g)      The Form 10-Q failed to disclose known trends, demands, commitments, events or uncertainties that defendants reasonably expected would have a material unfavorable impact on revenues in violation of SEC Regulation S-K Item 303, "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" ("Management's Discussion and Analysis"), regarding Whole Foods' reported earnings and growth that were driven in part by systemic and pervasive overpricing of pre-packaged perishable items, which comprised two thirds of the Company's sales.[12]  In addition, the Form 10-Q failed to disclose that the Company had entered into a tolling agreement with several California cities in February 2013, pertaining to an investigation into the failure to comply with applicable state laws regulating the advertising, weighing and pricing of grocery products, including systemic overcharging and knowingly marketing a short weight or taking a false tare on a container, at Whole Foods' California stores;[13] and

---

[12]   Regulation S-K Item 303(a)(3)(ii) and Instructions to Paragraph 303(a)(3) require companies:

Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

*                *                *

The discussion and analysis shall *focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results* . . . .

*See, e.g.*, *SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations*, Release Nos. 33-6835; 34-26831 (May 18, 1989).

[13]   At the time of entry of the tolling agreement, Whole Foods conducted business as Whole Foods Market California, Inc. in Northern California and as Mrs. Gooch's Natural Foods Markets, Inc. in Southern California.  The tolling agreement is not publicly available and thus plaintiff does not have, nor should it be expected to have, information regarding who negotiated or signed this agreement on Whole Foods' behalf.

- 22 -

(h)     Whole Foods' financial statements also were issued in violation of GAAP and SEC rules set forth below in the section titled: Whole Foods Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules.  *See* ¶¶124-138.

57.     <u>False and Misleading Statement.</u>  On November 6, 2013, Whole Foods issued a press release announcing its fourth quarter and fiscal year 2013 financial results as follows:

|  | 4Q13 | FY13 |
|---|---|---|
| Net income | $121 million | $551 million |
| EPS (diluted) | $0.32 | $1.47 |
| Sales | $2.976 billion | $12.917 billion |
| Gross Profit | $1.061 billion | $4.629 billion |
| Comps | 5.9% | 6.9% |

58.     <u>False and Misleading Statement.</u>  On the same day, November 6, 2013, Whole Foods hosted a conference call for analysts and investors, attended by defendants Robb, Mackey, Lannon, Gallo and Flanagan.  During the call, defendant Mackey reported the false financial results and falsely stated that the Company had addressed the pricing gap and was becoming more transparent:

> ***We have narrowed the price gap versus our competitors*** on known value items to its narrowest margin yet ***while continuing to raise the bar even higher on our standards of transparency***.

59.     <u>False and Misleading Statement.</u>  On November 22, 2013, Whole Foods filed its Form 10-K with the SEC for the period ended September 29, 2013, which included the false and misleading Sarbanes-Oxley certifications of Mackey, Robb and Flanagan in substantially identical form as set forth in ¶55.  In addition to reiterating the financial results reported on November 6, 2013, which defendants stated were prepared in accordance with GAAP, the Form 10-K again highlighted defendants' commitment to corporate responsibility and transparency:

> We seek to be a deeply responsible company in the communities where we do business around the world, ***providing ethically sourced, high-quality products and transparent information to our customers*** . . . .

60.     <u>Reasons Why Statements in ¶¶57-59 Were Knowingly False and Misleading</u>.  The statements set forth above concerning the Company's financial results, pricing versus competitors

and transparency were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants Whole Foods, Mackey, Robb and Flanagan:

(a)     The Company's reported financial results were driven in part by systemic and pervasive overpricing and mispricing of pre-packaged foods caused by routine tare weight errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

(b)     Whole Foods routinely overcharged customers and engaged in known and preventable weights and measures violations on its pre-packaged foods, which defendants acknowledged could negatively (and materially) impact the Company's reputation and customer trust – and consequently the Company's sales, revenue and margins (and stock price);

(c)     Due to the widespread overcharging on pre-packaged foods, the Company's products were not priced favorably nor competitively, but were overpriced;

(d)     Whole Foods was then the subject of an ongoing, statewide investigation in California (with which it had already entered into a tolling agreement) of substantial and repeated weights and measures violations, including its failure to deduct the weight of containers, which would later result in significant fines, permanent injunction and forced changes to its business practices;

(e)     Whole Foods' disclosure controls and procedures were either inadequately designed and insufficient to ensure that Whole Foods' rampant overcharging of customers for pre-packaged items was made known to Mackey, Robb and Flanagan, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that Mackey, Robb and Flanagan (and Whole Foods, by extension) were unaware of rampant overcharging and the investigation in California, but they failed to disclose these material facts or stop the overcharging;

- 24 -

(f)     Whole Foods' internal controls over financial reporting were insufficient to prevent the Company from systemically overstating the weight of pre-packaged foods and overcharging customers and insufficient to ensure the reliability of the Company's financial reports as Whole Foods' financial results were inaccurate and in violation of GAAP and SEC rules due to the improper recognition of revenues not "earned," specifically, the revenues reported were in part the result of systemic overcharging;

(g)     Whole Foods' financial statements did not fairly represent the financial condition because revenue and earnings were materially misstated.  The Company's undisclosed, widespread overcharging on pre-packaged foods gave the false impression that the Company was reporting stable and accurate financial results that generally reflected consumer demand for Whole Foods' products notwithstanding admittedly increased competition.  In truth, however, the financial statements, in addition to being materially overstated, failed to reflect consumer sentiment and tolerance for Whole Foods' pricing;

(h)     The statements in the Management's Discussion and Analysis section of the Form 10-K failed to disclose known trends, demands, commitments, and uncertainties regarding Whole Foods' business prospects as set forth in ¶56(g); and

(i)     Whole Foods' financial statements also were issued in violation of GAAP and SEC rules set forth below in the section titled: Whole Foods Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules.

61.     <u>False and Misleading Statement.</u>  On February 12, 2014, Whole Foods issued a press release announcing its first quarter fiscal 2014 financial results reporting net income of $158 million, or $0.42 diluted EPS, sales of $4.2 billion, gross profit of approximately $1.5 billion and comps of 5.4%.

62.     <u>False and Misleading Statement.</u>  On the same day, February 12, 2014, Whole Foods hosted a conference call for analysts, media representatives and investors attended by defendants Robb, Mackey, Lannon and Flanagan.  During that call, in addition to repeating the false financial

results, defendants made the following false and misleading statements assuring investors that the

Company's current competitive pricing initiatives and their effect on the quarterly financial results

would provide future benefit to customers and shareholders. Defendants acknowledged the

significance of competitive pricing and that at Whole Foods, more competitive prices yielded more

customers shopping and buying more products:

> [ROBB:] Our sales momentum and operating disciplines, along with moderating inflation, helped to generate another quarter of record gross margin for Q1. Occupancy leverage was partially offset by a slight increase in cost of goods sold, reflecting our expanded price investments. ***Our internal pricing surveys showed improvements from Q4 to Q1, in a competitive price positioning across virtually all competitors in all areas – known value items, non-perishables, and perishables***. While we are seeing a sales and gross-margin impact, based on our prior experience we believe the impact will be short-term, and that our value strategy will benefit both customers and shareholders over the longer term.

> *        *        *

> [LANNON:] The good news about price investments is that in the short term it hurts comps, because if you have the same customers coming in and they're paying a little bit less per item, that's going to bring comps down.

> But we found that after two or three quarters, the positive impact of lowering those prices begins to be felt in the comp base, as we begin to see our basket size increase, and we have on the margin more customers shopping with us. Short term, it's not good from a comp standpoint, but we think it's the right strategic move for the Company, and we believe it's going to pay off for our shareholders down the road.

63.     <u>False and Misleading Statement.</u>  On February 21, 2014, Whole Foods filed its

quarterly report on Form 10-Q with the SEC for the period ended January 19, 2014 which repeated

the false financial results reported in the February 12, 2014 press release, which defendants stated

were prepared in accordance with GAAP, and included the false and misleading Sarbanes-Oxley

certifications of Mackey, Robb and Flanagan in substantially identical form as set forth in ¶55.  In

the Results of Operations section of the 1Q14 Form 10-Q, defendants stated the following with

respect to the Company's financial performance:

> The Company's gross profit as a percentage of sales was approximately 35.0% for both the sixteen weeks ended January 19, 2014 and the same period of the prior fiscal year.  Gross profit as a percentage of sales increased six basis points for the sixteen weeks ended January 19, 2014 compared to the same periods of the prior

fiscal year.  The increase is a result of leverage in occupancy costs, which was partially offset by a slight increase in cost of goods sold as a percentage of sales, reflecting our expanded price investments.  ***These efforts include improving our relative price positioning, expanding our value offerings across the store, and increasing our promotional activity***.

64.      <u>False and Misleading Statement.</u>  On March 12, 2014, defendant Robb spoke at the UBS Global Consumer Conference, a conference for analysts and investors.  Consistent with the Company's core marketing theme of strong values and customer trust, Robb specifically identified Whole Foods as a leader of the natural products industry in large part because of defendants' commitment to high standards and transparency of information:

> ***Whole Foods Market has the highest standards in the supermarket industry of any company*** . . . .
>
> ***The transparency that is going to continue to unfold over the coming years, that is where we are the leaders and we will continue to be the leaders.***

*      *      *

> And it is not just the quality of the products; it ***is the quality of the standards behind the products***.

65.      <u>Reasons Why Statements in ¶¶61-64 Were Knowingly False and Misleading.</u>  The statements set forth above concerning the Company's financial results, pricing, operating discipline and transparency were each materially false and misleading when made and failed to disclose the following true facts, which were then known to or recklessly disregarded by defendants Whole Foods, Mackey, Robb, Flanagan and Lannon:

(a)      The Company's reported financial results were driven in part by systemic and pervasive overpricing and mispricing of pre-packaged foods caused by routine tare weight errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

(b)      Whole Foods routinely overcharged customers and engaged in known and preventable weights and measures violations on its pre-packaged foods, which defendants

acknowledged could negatively (and materially) impact the Company's reputation and customer trust – and consequently the Company's sales, revenue and margins;

(c)     Due to the widespread overcharging on pre-packaged foods, the Company's products were not priced favorably nor competitively, but were overpriced;

(d)     Whole Foods was then the subject of an ongoing, statewide investigation in California (with which it had already entered into a tolling agreement) of substantial and repeated weights and measures violations, including its failure to deduct the weight of containers, which would later result in significant fines, a permanent injunction and forced changes to its business practices;

(e)     Whole Foods' disclosure controls and procedures were either inadequately designed and insufficient to ensure that Whole Foods' rampant overcharging of customers for pre-packaged items was made known to Mackey, Robb and Flanagan, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that Mackey, Robb and Flanagan were unaware of rampant overcharging and the investigation in California, but they failed to disclose these material facts or stop the overcharging;

(f)     Whole Foods' internal controls over financial reporting were insufficient to prevent the Company from systemically overstating the weight of pre-packaged foods and overcharging customers and insufficient to ensure the reliability of the Company's financial reports as Whole Foods' financial results were inaccurate and in violation of GAAP and SEC rules due to the improper recognition of revenues not "earned," specifically, the revenues reported were in part the result of systemic overcharging;

(g)     Whole Foods' financial statements did not fairly represent the financial condition because revenue and earnings were materially misstated. The Company's undisclosed, rampant overcharging led investors to believe that the Company was reporting relatively stable and accurate financial results that generally reflected consumer demand for Whole Foods' products notwithstanding increased competition. In truth, however, the financial statements, in addition to

- 28 -

being materially overstated, failed to reflect consumer sentiment and tolerance for Whole Foods' pricing;

(h)     The statements in the Management's Discussion and Analysis section of the Form 10-Q failed to disclose known trends, demands, commitments, and uncertainties regarding Whole Foods' business prospects as set forth in ¶56(g); and

(i)     Whole Foods' financial statements also were issued in violation of GAAP and SEC rules set forth below in the section titled: Whole Foods Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules.

66.     <u>False and Misleading Statement.</u>  On May 6, 2014, Whole Foods issued a press release announcing its second quarter fiscal 2014 financial results, reporting net income of $142 million, or $0.38 diluted EPS, sales of $3.3 billion, gross profit of approximately $1.2 billion and comps of 4.5%.  On the same day, May 6, 2014, Whole Foods hosted a conference call for analysts, media representatives and investors attended by defendants Robb, Flanagan, Meyer, Gallo and Lannon.  During the call, defendants again reiterated the false financial results published earlier that day, and the Company's purported value proposition, emphasizing its focus on beating the competition through cost-cutting and strategic pricing:

> [MACKEY:] Our value strategy, while impacting our sales growth and gross margin year-to-date, has driven significant improvements in our relative pricing position, improvements of over 400 basis points in some cases.  Based on our prior experience, we believe these investments will translate into higher sales growth over time.  We have mentioned value [*i.e.*, pricing] several times today, which is certainly important as we seek to appeal to a broader customer base. . . .
>
> *              *              *
>
> [ROBB:]  There's some headwinds here and there's some quick changes in the marketplace.  But this Company has 36 years of a track record of being the leader in the Nat food industry and ***continuing to make these investments strategically in price and in technology and differentiation and evolution***.  And I think over the long term this is the right path for us and we are absolutely 110% focused on this competitive battle.
>
> *              *              *
>
> [GALLO:] ***[We are] really focused on being really competitive with our prices***. . . .

- 29 -

\*      \*      \*

[MACKEY:]  One thing people don't quite understand is that when you lower a price, the first impact on it is it lowers your comps. ***You're selling the same amount of product, for the most part, at a lower price.***  So your sales are slightly lower.

Over time, though, as people come to see that, you'll hopefully get lift on that item as people purchase more of it and the overall perception of your basic price value ratio is improved and it helps your overall sale.

67.     <u>False and Misleading Statement.</u>  On May 16, 2014, Whole Foods filed its quarterly report on Form 10-Q with the SEC for the period ended April 13, 2014 which repeated, in substance, the false statement reported in the May 6, 2014 press release, which defendants stated were prepared in accordance with GAAP, and included the false and misleading Sarbanes-Oxley certifications of Mackey, Robb and Flanagan in substantially identical forms as stated in ¶55.

68.     <u>Reasons Why Statements in ¶¶66-67 Were Knowingly False and Misleading.</u>  The statements set forth above concerning the Company's financial results, pricing and internal controls were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants Whole Foods, Mackey, Robb, Flanagan and Gallo:

(a)     The Company's reported financial results were driven in part by systemic and pervasive overpricing and mispricing of pre-packaged foods caused by routine tare weight errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

(b)     Whole Foods routinely overcharged customers and engaged in known and preventable weights and measures violations on its pre-packaged foods, which defendants acknowledged could negatively (and materially) impact the Company's reputation and customer trust – and consequently the Company's sales, revenue and margins (and stock price);

(c)     Due to the widespread overcharging on pre-packaged foods, the Company's products were not priced favorably nor competitively, but were overpriced;

(d)     Whole Foods was then the subject of an ongoing, statewide investigation in California (with which it had already entered into a tolling agreement) of weights and measures violations, including its failure to deduct the weight of containers, which would later result in significant fines, permanent injunction and forced changes to its business practices;

(e)     Whole Foods' disclosure controls and procedures were either inadequately designed and insufficient to ensure that Whole Foods' rampant overcharging of customers for pre-packaged items was made known to Mackey, Robb and Flanagan, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that Mackey, Robb and Flanagan were unaware of rampant overcharging and the investigation in California, but they failed to disclose these material facts or stop the overcharging;

(f)     Whole Foods' internal controls over financial reporting were insufficient to prevent the Company from systemically overstating the weight of pre-packaged foods and overcharging customers and insufficient to ensure the reliability of the Company's financial reports as Whole Foods' financial results were inaccurate and in violation of GAAP and SEC rules due to the improper recognition of revenues not "earned," specifically, the revenues reported were in part the result of systemic overcharging;

(g)     Whole Foods' financial statements did not fairly represent the financial condition because revenue and earnings were materially misstated.  The Company's undisclosed, rampant overcharging led investors to believe that the Company was reporting relatively stable and accurate financial results that generally reflected consumer demand for Whole Foods' products notwithstanding increased competition.  In truth, however, the financial statements, in addition to being materially overstated, failed to reflect consumer sentiment and tolerance for Whole Foods' pricing;

- 31 -

(h)     The statements in the Management's Discussion and Analysis section of the Form 10-Q failed to disclose known trends, demands, commitments, and uncertainties regarding Whole Foods' business prospects as set forth in ¶56(g); and

(i)     Whole Foods' financial statements also were issued in violation of GAAP and SEC rules set forth below in the section titled: Whole Foods Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules.

Whole Foods Is Sued by the State of California for Overcharging Customers and Is Fined and Permanently Enjoined from Weights and Measures Violations in California

69.     On June 11, 2014, after an investigation into Whole Foods' pricing at locations throughout California – Whole Foods' largest geographic market, at 73 stores (at the time) – the City Attorneys for Los Angeles, Santa Monica, and San Diego on behalf of the State of California filed a complaint against the Company, alleging that Whole Foods had violated California law by selling packaged items that contained less than the amount stated on the packaging, failing to deduct the tare weight when selling pre-packaged items and selling items by unit when California law required them to be sold by weight.[14]  According to the State of California's Complaint:

- Defendants made untrue or misleading statements in connection with the sale of items to the public in California, with statements constituting false advertising within the meaning of Cal. Bus. & Prof. Code §17500.

- Defendants did sell any item in less quantity than it was represented to be in violation of Cal. Bus. & Prof. Code §12024.2.

- Defendants did mark a short weight or taking a false tare on any container in violation of Cal. Bus. & Prof. Code §12021.

---

[14]     *See generally People of the State of Cal. v. Whole Foods Mkt. Cal., Inc*., No. SC122679, (Cal. Super. Ct. L.A. Cty.) (the "*California* Action"); *see also People of the State of Cal. v. Whole Foods Mkt. Cal., Inc*., No. SC122679, Complaint for Injunction, Civil Penalties, and Other Equitable Relief (Cal. Super. Ct. L.A. Cty. June 11, 2014) (the "California Complaint"), Ex. 6, attached hereto. Whole Foods and the People entered into an agreement to toll any applicable statutes of limitation from February 20, 2013 through the filing of the People's Complaint and the Stipulated Judgment filed June 18, 2014.  *See* California Stipulation.

- Defendants did sell a pre-packaged commodity in less quantity than represented in violation of Cal. Bus. & Prof. Code §12024.3.

70.    On June 18, 2014, after what the State of California described as "lengthy negotiations," Whole Foods entered into the California Stipulation, signed by John H. Hempfling II, Whole Foods Markets' Global Litigation Counsel, among others, to settle the allegations in the amount of $800,000, for overcharging customers.  Pursuant to the permanent injunction, defendants were "enjoined and restrained for a period of five years from the date of entry of . . . Final Judgment from engaging in any of the following [nine] acts or practices [including] [k]nowingly marking a short weight or taking a false tare on any container."  California Stipulation at 4.  In addition to the fines, the June 18, 2014 Stipulation was significant in that placed requirements on the Company, which were known to defendants, to create control and reporting mechanisms to address the violations for four years including, but not limited to, the following:

- Whole Foods shall appoint one central State Coordinator ("SC") for each California corporation who shall be responsible for overseeing the defendants' compliance program;

- Each defendants' store in California shall designate an employee or employees whose responsibilities shall include pricing accuracy in that store;

- Defendants' employees, or a third-party provider retained by defendants, shall conduct random in-store price-checking audits in every store on a quarterly basis;

- Whenever a defendants' store leader receives a "Report of Pricing Discrepancy," the store leader shall promptly investigate whether there is an error; and

- When the SC receives a Report of Pricing Discrepancy, the SC shall promptly investigate whether a system error at the corporate level occurred.

California Stipulation at 5-7.

71.    On June 26, 2014, in response to the California overcharging settlement, Whole Foods issued "An open letter to Whole Foods Market shoppers *in California and beyond*" in which the Company admitted to overcharging customers and acknowledged that such a violation of trust could affect whether customers would continue to shop at Whole Foods.  The letter also emphasized

the importance of customers' trust in Whole Foods, and again sought to distinguish Whole Foods

from other grocers that may have had similar mispricing issues:

> [We are] well aware that any violation of [your] trust – however unintentional – can impact your feelings about shopping in our stores.  We take our obligations to you very seriously and ***we always strive for transparency and accuracy in everything we do***.
>
> *       *       *
>
> ***[W]e know we're not other retailers – we're Whole Foods Market, and we take pride in setting higher standards for quality and customer satisfaction that have helped push the entire grocery industry to do better***.

(Some emphasis in original.)

72.     After the Company had entered into the California Stipulation, defendants, with

knowledge or recklessness, continued to make the following materially false and misleading

statements detailed below while failing to disclose continuing on-going violations and facts known

to the Company.

73.     <u>False and Misleading Statement.</u>  On July 30, 2014, Whole Foods issued a press

release announcing its third quarter fiscal 2014 financial results, reporting net income of $151

million, or $0.41 diluted EPS, sales of $3.4 billion, gross profit of over $1.2 billion and comps of

3.9%.  The release stated in part:

> "Our business model is producing industry-leading sales per square foot, healthy returns on invested capital and strong operating cash flow," said Walter Robb, co-chief executive officer of Whole Foods Market.

74.     <u>False and Misleading Statement.</u>  On the same day, Whole Foods hosted a conference

call for analysts, media representatives and investors attended by defendants Mackey, Robb,

Flanagan, Gallo, and Lannon.  During that call, defendants repeated the false financial results and

defendant Robb spoke about defendants' continued efforts to make Whole Foods' pricing

competitive and change the "Whole Paycheck" narrative:

> [ROBB:]  ***[W]e believe our value efforts continue to be a key element in driving sales growth over the long-term.***  Last year, for the first time, we implemented a

- 34 -

significant competitive price match on hundreds of grocery items at the national level.

> *Our focus going forward is primarily in perishables,* where we see opportunities *to narrow price gaps on select known value items,* broaden our selection of products at entry-level price points, and increase promotions. . . .

*          *          *

Natural and organic products are increasingly available, but no one does what we do.  Our brand and our marketing campaign will highlight both our value and our values, *reinforcing our leadership around quality and transparency in the marketplace*.

*          *          *

[MACKEY:]  The [Values Matter] campaign is going to be focused more on our differentiation, our values.  *We're going to remind our customers, and also people who don't know Whole Foods very well, what we really stand for, and how we're different and better than many of our competitors*.

75.    <u>False and Misleading Statement.</u>  On August 8, 2014, Whole Foods filed its quarterly report on Form 10-Q with the SEC for the period ended July 6, 2014 which repeated, in substance, the false and misleading statements in the July 30, 2014 press release, which defendants stated were prepared in accordance with GAAP, and included the false and misleading Sarbanes-Oxley certifications of Mackey, Robb and Flanagan in substantially identical form as set forth in ¶55.

76.    <u>Reasons Why Statements in ¶¶73-75 Were Knowingly False and Misleading</u>.  The statements set forth above concerning the Company's financial results, competitive position on pricing and adequacy of internal controls were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants Whole Foods, Mackey, Robb and Flanagan:

(a)    The Company's reported financial results were driven in part by systemic and pervasive overpricing and mispricing of pre-packaged foods caused by routine tare weight errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

- 35 -

(b)     Whole Foods routinely overcharged customers and engaged in known and preventable weights and measures violations on its pre-packaged foods, which defendants acknowledged could negatively (and materially) impact the Company's reputation and customer trust – and consequently the Company's sales, revenue and margins (and stock price);

(c)     Due to the widespread overcharging on pre-packaged foods, the Company's products were not priced favorably nor competitively, but were overpriced;

(d)     Whole Foods has been the subject of an ongoing, statewide investigation in California of substantial and repeated weights and measures violations, including failing to deduct the weight of containers, and despite the settlement and permanent injunction entered in that case, failed to implement sufficient processes to adequately address and prevent the pervasive tare weight errors going forward not just in California (where 20% of Whole Foods' stores are located) but around the country;

(e)     Whole Foods' disclosure controls and procedures were either inadequately designed and insufficient to ensure that Whole Foods' rampant overcharging of customers for pre-packaged items was made known to Mackey, Robb and Flanagan, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that Mackey, Robb and Flanagan were unaware of rampant overcharging and the investigation in California, but they failed to disclose these material facts or stop the overcharging;

(f)     Whole Foods' internal controls over financial reporting were insufficient to prevent the Company from systemically overstating the weight of pre-packaged foods and overcharging customers and insufficient to ensure the reliability of the Company's financial reports as Whole Foods' financial results were inaccurate and in violation of GAAP and SEC rules due to the improper recognition of revenues not "earned," specifically, the revenues reported were in part the result of systemic overcharging;

(g)     Whole Foods' financial statements did not fairly represent the financial condition because revenue and earnings were materially misstated.  The Company's undisclosed,

rampant overcharging led investors to believe that the Company was reporting relatively stable and accurate financial results that generally reflected consumer demand for Whole Foods' products notwithstanding increased competition. In truth, however, the financial statements, in addition to being materially overstated, failed to reflect consumer sentiment and tolerance for Whole Foods' pricing;

(h)     The statements in the Management's Discussion and Analysis section of the Form 10-Q failed to disclose known trends, demands, commitments, and uncertainties regarding Whole Foods' business prospects as set forth in ¶56(g); and

(i)     Whole Foods' financial statements also were issued in violation of GAAP and SEC rules set forth below in the section titled: Whole Foods Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules.

Albany, New York Weights and Measures Violations; Company Launches "Values Matter" Campaign

77.     In August 2014, just *weeks* after paying an $800,000 fine, agreeing to reform their weights and measures compliance program and promising the public that it would "strive for transparency and accuracy in everything we do," Whole Foods was once again caught overcharging customers in Albany, New York for pre-packaged foods that weighed less than the labels indicated – the same problem at issue in California – resulting in thousands of dollars of fines.

78.     In the wake of the California permanent injunction and settlement and Albany, New York fine, Whole Foods launched its first national advertising campaign in October 2014. The campaign, called "Values Matter," represented defendants' effort to "'distinguish what makes [Whole Foods] special, our food different and our quality superior. It's our opportunity to reaffirm our unwavering commitments to our core values, which are at the heart of our brand.'" By undertaking this effort on such a large scale, defendants acknowledged that price integrity and transparency were material to Whole Foods' success and ability to grow revenues and margins. One

analyst noted that Whole Foods' campaign would "emphasiz[e] how Whole Foods is different from other grocers in terms of its quality [and] ***transparency***" and stated that the Company's "decision to launch [the] campaign couldn't be more timely."

79.   <u>False and Misleading Statement.</u>   On November 5, 2014, Whole Foods issued a press release announcing its fourth quarter and fiscal year 2014 financial results as follows:

|  | 4Q14 | FY14 |
|---|---|---|
| Net income | $128 million | $579 million |
| EPS (diluted) | $0.35 | $1.57 |
| Sales | $3.256 billion | $14.194 billion |
| Gross Profit | $1.154 billion | $5.044 billion |
| Comps | 3.1% | 4.3% |

80.   <u>False and Misleading Statement.</u>   On the same day, November 5, 2014, Whole Foods hosted a conference call for analysts, media representatives and investors attended by defendants Mackey, Robb, Flanagan, Gallo and Lannon.  During the call, defendants stated that the Company's ongoing advertising campaign called out what makes Whole Foods . . . different from its competitors and focused on product pricing to drive customer traffic:

> [MACKEY:] ***We remain committed to the highest quality standards and to expanding our value offering***.  ***Our value focus is on perishables***, where we see opportunities to broaden our selection of products at entry-level price points, increase promotions and ***narrow price gaps on select known value items***. We are encouraged by the pricing experiments we are running in several markets. . . .

> \*      \*      \*

> [LANNON:] So we have – ***we feel like we are matching toe-to-toe with all of our competitors where we are doing these tests.  And our customers are responding, transactions are up, unit growth is up***. It's early days, but the first six weeks.  And they are in the store, they are excited about buying those items, and then they continue to shop throughout the rest of the store.  So it's definitely making us more nimble in those markets.  And we're taking advantage of it.

81.   <u>False and Misleading Statement.</u>   On November 21, 2014, Whole Foods filed its annual report on Form 10-K with the SEC for the period ended September 28, 2014, which repeated the financial results reported on November 5, 2014, which defendants stated were prepared in accordance with GAAP, and included the false and misleading Sarbanes-Oxley certifications of

Mackey, Robb and Flanagan in substantially the same form as set forth in ¶55.  Defendants also reiterated their commitment to corporate responsibility and transparency:

> ***We seek to be a deeply responsible company*** in the communities where we do business around the world, providing ethically sourced, high-quality products ***and transparent information to our customers*** . . . .

82.   <u>Reasons Why Statements in ¶¶79-81 Were Knowingly False and Misleading</u>.  The statements set forth above concerning the Company's financial results, transparency, pricing and adequacy of its internal controls were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants Whole Foods, Mackey, Robb, Flanagan and Lannon:

(a)   The Company's reported financial results were driven in part by systemic and pervasive overpricing and mispricing of pre-packaged foods caused by routine tare weight errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

(b)   Whole Foods routinely overcharged customers and engaged in known and preventable weights and measures violations on its pre-packaged foods, which defendants acknowledged could negatively (and materially) impact the Company's reputation and customer trust – and consequently the Company's sales, revenue and margins (and stock price);

(c)   Due to the widespread overcharging on pre-packaged foods, the Company's products were not priced favorably nor competitively, but were overpriced;

(d)   Despite having entered into a settlement and permanent injunction in California where 20% of Whole Foods' stores are located, the Company failed to implement sufficient processes to adequately address and prevent the pervasive tare weight errors going forward not just in California, but around the country;

- 39 -

(e)     Whole Foods' disclosure controls and procedures were either inadequately designed and insufficient to ensure that Whole Foods' rampant overcharging of customers for pre-packaged items was made known to Mackey, Robb and Flanagan, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that Mackey, Robb and Flanagan were unaware of rampant overcharging and the investigation in California, but they failed to disclose these material facts or stop the overcharging;

(f)     Whole Foods' internal controls over financial reporting were insufficient to prevent the Company from systemically overstating the weight of pre-packaged foods and overcharging customers and insufficient to ensure the reliability of the Company's financial reports as Whole Foods' financial results were inaccurate and in violation of GAAP and SEC rules due to the improper recognition of revenues not "earned," specifically, the revenues reported were in part the result of systemic overcharging;

(g)     Whole Foods' financial statements did not fairly represent the financial condition because revenue and earnings were materially misstated.  The Company's undisclosed, rampant overcharging led investors to believe that the Company was reporting relatively stable and accurate financial results that generally reflected consumer demand for Whole Foods' products notwithstanding increased competition.  In truth, however, the financial statements, in addition to being materially overstated, failed to reflect consumer sentiment and tolerance for Whole Foods' pricing;

(h)     The statements in the Management's Discussion and Analysis section of the Form 10-K failed to disclose known trends, demands, commitments, and uncertainties regarding Whole Foods' business prospects as set forth in ¶56(g); and

(i)     Whole Foods' financial statements also were issued in violation of GAAP and SEC rules set forth below in the section titled: Whole Foods Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules.

Additional Weights and Measures Violations

83.     In January 2015, for the second time in six months, inspectors in Albany, New York uncovered evidence that Whole Foods was misrepresenting the weight of pre-packaged foods, resulting in overcharges to customers.  Once again, Whole Foods was fined thousands of dollars for these infractions.

84.     In addition, since agreeing to the injunction in June 2014, Whole Foods has been cited for numerous weights and measures violations in California.  Indeed, as late as August 2016, city attorneys in Los Angeles, San Diego, and Santa Monica were seeking the court's assistance in enforcing the permanent injunction issued in 2014.

85.     <u>False and Misleading Statement.</u>  On February 11, 2015, Whole Foods issued a press release announcing its first quarter fiscal 2015 financial results, reporting net income of $167 million, or $0.46 diluted EPS, sales of $4.7 billion, gross profit of over $1.6 billion and comps of 4.5%.  The press release, quoting Robb, stated in part:

> "We are pleased with our first quarter results which reflect accelerating comparable store sales growth and healthy returns.  We attribute our broad-based sales momentum to our customers' positive response to our many strategic initiatives, along with improving consumer confidence."

86.     <u>False and Misleading Statement.</u>  On the same day, February 11, 2015, Whole Foods hosted a conference call for analysts, media representatives and investors attended by defendants Mackey, Robb, Flanagan, Gallo, Lannon and Meyer.  During the call, defendants Mackey and Robb reported on the results of defendants' continued pricing initiatives in select markets:

> [ROBB:] ***We continue to see unit lift from the lower produce pricing we are testing in several markets***, which included external marketing to support these investments. It is too early for conclusive results, particularly given the holidays. However, we're looking at expanding the test to additional markets as ***we believe more competitive produce pricing will greatly benefit our overall value perception***.

87.     In a February 12, 2015 report, analysts at William Blair credited Whole Foods' pricing initiatives for its impressive quarter:

Business momentum continues to improve with comp-store sales accelerating further thus far into the fiscal second quarter on both a one- and two-year basis, driven by a pickup in store traffic. ***Importantly, the recent improvement appears largely driven by internal initiatives, including recent pricing and marketing investments*** . . . .

88.     <u>False and Misleading Statement.</u>   On February 27, 2015, Whole Foods filed its quarterly report on Form 10-Q with the SEC which repeated, in substance, the financial results announced on February 11, 2015, which defendants stated were prepared in accordance with GAAP. The 1Q15 Form 10-Q included the false and misleading Sarbanes-Oxley certifications of Mackey, Robb and Flanagan in substantially similar form as set forth in ¶55.

89.     <u>False and Misleading Statement.</u>   Also on February 27, 2015, the Company hosted its first-ever Investor Conference at its headquarters in Austin, Texas.   Defendants Mackey and Robb discussed the importance of Whole Foods' relationship of trust with its customers and that the Company was continuing to reach for new levels of transparency and accountability.   Defendants also reiterated that values are important to the Company but that "value," *i.e.*, price matters too:

[MACKEY:]  We are excited about taking back control of our brand. We think it's been misrepresented and misunderstood.  And the Values Matter campaign really allowed us to focus in and communicate to our team members, to our customers, and to the investment community exactly what Whole Foods stands for.

*         *         *

[ROBB:]  And again, I would say to you that people may have an opinion about Whole Foods one way or the other, but one thing they might give you is that in fact people do trust us.  They trust us for the quality that we offer.  And that is a currency of building relationships with customers in the 21st century . . . .

*         *         *

[W]e're going to be relevant on the price areas that we need to be. ***But we are going to focus on building a new race to the top***, because we think this marketplace is just opening up in ways we never imagined, that ***we're going to concentrate in building that new top for this industry: new levels of quality, new levels of transparency, new levels of accountability across the entire business***.

*         *         *

[MACKEY:]  Well, we know that, as you can see from our anthem, ***we believe values matter . . . . But we also know it's important that we be relevant on price.  We know that also values matter but value matters too and so we have made investments in price in selected markets*** and we've done a lot of experiments on it.

90.     Analysts' response to Whole Foods' Investor day event was positive, reporting that

their "confidence was increased" and that the event "renewed" their "appreciation for the company's

growth opportunity, differentiated concept and management team." On February 27, 2015, analysts

at Morgan Stanley wrote:

> We are positive on WFM following its first ever investor day – *management demonstrated both what makes Whole Foods great and how they plan to expand WFM's leading position going forward*. We see a long runway ahead for this natural/organic leader. . . .
>
>      . . . As the company has done for the past 3+ decades, Whole Foods is staying at the forefront of trends in natural foods retailing, never standing still in the face of competition.  *Whole Foods is increasing transparency with both investors and customers, which we believe is the right strategy for sustained loyalty to WFM long-term*.
>
> *        *        *
>
> • **Value Efforts**: Price investments to-date have largely focused on produce – Whole Foods is undergoing 6-7 different pricing experiments across the country, with plans to expand over time. . . . *Bigger picture, management is focused on the differentiated store experience but understands WFM needs to remain relevant on price as well*.

91.     On March 1, 2015, Sterne Agee analysts reported that:

> Whole Foods continues to take the approach that it is not participating in a race to the bottom, but instead is looking to create a new race to the top in terms of *new levels of product* (i) quality, *(ii) transparency, and (iii) accountability*. First, Whole Foods continues to add value by developing higher standards, such as the company's recently launched Responsibly Grown produce rating system. Such programs, along with several others (60% of grocery sales are certified organic), have *raised the Whole Foods brand as the best quality in the industry. As a result, shoppers trust each and every item in the store* – a huge advantage for the company, particularly as more U.S. households look to eat healthier.

92.     <u>Reasons Why Statements in ¶¶85-86, 88-89 Were Knowingly False and Misleading</u>.

The statements set forth above concerning pricing were each materially false and misleading when

made because they omitted the true facts, which were then known to or recklessly disregarded by

defendants Whole Foods, Mackey, Robb and Flanagan:

        (a)     The Company's reported financial results were driven in part by systemic and

pervasive overpricing and mispricing of pre-packaged foods caused by routine tare weight errors,

- 43 -

including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

(b)     Whole Foods routinely overcharged customers and engaged in known and preventable weights and measures violations on its pre-packaged foods, which defendants acknowledged could negatively (and materially) impact the Company's reputation and customer trust – and consequently the Company's sales, revenue and margins (and stock price);

(c)     Due to the widespread overcharging on pre-packaged foods, the Company's products were not priced favorably nor competitively, but were overpriced;

(d)     Despite having entered into a settlement and permanent injunction in California where 20% of Whole Foods' stores are located, the Company failed to implement sufficient processes to adequately address and prevent the pervasive tare weight errors going forward not just in California, but around the country;

(e)     Whole Foods' disclosure controls and procedures were either inadequately designed and insufficient to ensure that Whole Foods' rampant overcharging of customers for pre-packaged items was made known to Mackey, Robb and Flanagan, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that Mackey, Robb and Flanagan were unaware of rampant overcharging and the investigation in California, but they failed to disclose these material facts or stop the overcharging;

(f)     Whole Foods' internal controls over financial reporting were insufficient to prevent the Company from systemically overstating the weight of pre-packaged foods and overcharging customers and insufficient to ensure the reliability of the Company's financial reports as Whole Foods' financial results were inaccurate and in violation of GAAP and SEC rules due to the improper recognition of revenues not "earned," specifically, the revenues reported were in part the result of systemic overcharging;

- 44 -

(g)     Whole Foods' financial statements did not fairly represent the financial condition because revenue and earnings were materially misstated.  The Company's undisclosed, rampant overcharging led investors to believe that the Company was reporting relatively stable and accurate financial results that generally reflected consumer demand for Whole Foods' products notwithstanding increased competition.  In truth, however, the financial statements, in addition to being materially overstated, failed to reflect consumer sentiment and tolerance for Whole Foods' pricing;

(h)     The statements in the Management's Discussion and Analysis section of the Form 10-Q failed to disclose known trends, demands, commitments, and uncertainties regarding Whole Foods' business prospects as set forth in ¶56(g); and

(i)     Whole Foods' financial statements also were issued in violation of GAAP and SEC rules set forth below in the section titled: Whole Foods Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules.

93.     <u>False and Misleading Statement.</u>  On May 6, 2015, Whole Foods issued a press release announcing its second quarter fiscal 2015 financial results, reporting net income of $158 million, or $0.44 diluted EPS, sales of  $3.6 billion, gross profit of $1.3 billion and comps of 3.6%.  The release stated in part:

> "Our results reflect another quarter of record sales and healthy returns on invested capital," said John Mackey, co-founder and co-chief executive officer of Whole Foods Market.  "***Our Whole Foods Market brand has helped lead the shift in consciousness toward fresh, healthy foods by offering the highest quality, broadest selection, and best customer service*** . . . ."

94.     <u>False and Misleading Statement.</u>  On May 15, 2015, Whole Foods filed its quarterly report on Form 10-Q with the SEC for the period ended May 6, 2015 which repeated the false financial results repeated in the May 6, 2015 press release, which defendants stated were prepared in accordance with GAAP, including the false and misleading Sarbanes-Oxley certifications of Mackey, Robb and Flanagan in substantially similar form as set forth in ¶55.

95. <u>Reasons Why Statements in ¶¶93-94 Were Knowingly False and Misleading</u>. The statements set forth above were each materially false and misleading when made because they omitted the following true facts, which were then known to or recklessly disregarded by defendants Whole Foods, Mackey, Robb and Flanagan:

(a)     The Company's reported financial results were driven in part by systemic and pervasive overpricing and mispricing of pre-packaged foods caused by routine tare weight errors, including the widespread practice of failing to deduct the tare weight from a label, in part as a result of the lack of appropriate employee training and evident from the regular tare audits performed in each store across each region;

(b)     Whole Foods routinely overcharged customers and engaged in known and preventable weights and measures violations on its pre-packaged foods, which defendants acknowledged could negatively (and materially) impact the Company's reputation and customer trust – and consequently the Company's sales, revenue and margins (and stock price);

(c)     Whole Foods failed to implement sufficient processes to adequately address and prevent the pervasive tare weight errors going forward not just in California and New York (where 23% of Whole Foods' stores are located) but around the country;

(d)     Whole Foods' disclosure controls and procedures were either inadequately designed and insufficient to ensure that Whole Foods' rampant overcharging of customers for pre-packaged items was made known to Mackey, Robb and Flanagan, or the Company's disclosure controls and procedures were sufficient and it is therefore implausible that Mackey, Robb and Flanagan were unaware of rampant overcharging, the California investigation and settlement and the New York investigation, but they failed to disclose these material facts or stop the overcharging;

(e)     Whole Foods' internal controls over financial reporting were insufficient to prevent the Company from systemically overstating the weight of pre-packaged foods and overcharging customers and insufficient to ensure the reliability of the Company's financial reports

- 46 -

as Whole Foods' financial results were inaccurate and in violation of GAAP and SEC rules due to the improper recognition of revenues not "earned," specifically, the revenues reported were in part the result of systemic overcharging;

(f)     Whole Foods' financial statements did not fairly represent the financial condition because revenue and earnings were materially misstated.  The Company's undisclosed, rampant overcharging led investors to believe that the Company was reporting relatively stable and accurate financial results that generally reflected consumer demand for Whole Foods' products notwithstanding increased competition.  In truth, however, the financial statements, in addition to being materially overstated, failed to reflect consumer sentiment and tolerance for Whole Foods' pricing;

(g)     The statements in the Management's Discussion and Analysis section of the Form 10-Q failed to disclose known trends, demands, commitments, and uncertainties regarding Whole Foods' business prospects as set forth in ¶56(g); and

(h)     Whole Foods' financial statements also were issued in violation of GAAP and SEC rules set forth below in the section titled: Whole Foods Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules.

<u>New York City DCA Reveals Its Investigation of Whole Foods; Stock Price Remains Artificially Inflated</u>

96.     On June 24, 2015, the DCA announced it had uncovered systematic overcharging for pre-packaged foods at *all* of Whole Foods' New York City locations.  In a press release issued on that date, DCA explained:

> Department of Consumer Affairs (DCA) Commissioner Julie Menin today announced an ongoing investigation into Whole Foods after finding that the company's New York City stores routinely overstated the weights of its pre-packaged products – including meats, dairy and baked goods – resulting in customers being overcharged.  DCA tested packages of 80 different types of pre-packaged products and found *all of the products had packages with mislabeled weights*. Additionally, *89 percent of the packages tested did not meet the federal standard for the maximum amount that an individual package can deviate from the actual weight*, which is set by the U.S. Department of Commerce.  The overcharges ranged from $0.80 for a package of pecan panko to $14.84 for a package of coconut shrimp.

- 47 -

DCA's findings point to a ***systematic problem with how products packaged for sale at Whole Foods are weighed and labeled***.  The snapshot suggests that individual packages are routinely not weighed or are inaccurately weighed, resulting in overcharges for consumers. . . .  In some cases, ***this issue was found for the same exact products at multiple stores***.

\*          \*          \*

"Our inspectors tell me this is ***the worst case of mislabeling they have seen in their careers***, which DCA and New Yorkers will not tolerate. . . ."

DCA regularly inspects all of the city's supermarkets for scanner and scale accuracy, pricing, and charging tax on non-taxable items.  ***Last fall, DCA conducted in-depth inspections into how Whole Foods was weighing and labeling its pre-packaged foods and discovered troubling issues with their labeling of the weight of pre-packaged foods.  This winter, DCA revisited several stores and found products continued to be mislabeled*** . . . .

. . . ***The potential number of violations that Whole Foods faces for all pre-packaged goods in the NYC stores is in the thousands***.

97.     In the New York Litigation, Whole Foods filed the Moll affidavits and made representations to the court which provided further detail concerning the DCA's investigation.  For example, it is apparent from these representations that the DCA's investigation spanned a wide range of products in multiple departments, including meats, dairy and baked goods, and that the DCA identified to Whole Foods the products it found to be overpriced during the course of its investigation.  As described more fully in ¶¶128-129, in the context of the New York Litigation, Whole Foods has already reviewed the transaction records stored in the Company's data warehouse and compared those records to the notices of violation issued by the DCA (which are not publicly available) to determine that between June 2012 and June 2015, Whole Foods sold more than 16 million units of the specific products identified by the DCA as overpriced in the state of New York alone.  Whole Foods represented that its conservative estimate of the total overcharges for that period was over $9 million, for stores in New York only.

98.     On June 24, 2015, *The New York Times* published an article titled "Whole Foods Accused of Overcharging in New York City Stores."  The article further discussed the DCA's findings specifically noting that according to Julie Menin, commissioner of the DCA, that the same mispricing violations for which Whole Foods had been permanently enjoined in California were also

- 48 -

permeating the New York City market. The article further referenced the Company's Chief

Litigator, John Hempfling,[15] acknowledging that the Company had known about the DCA's

concerns since December 2014:

> The New York Department of Consumer Affairs accused Whole Foods Market on Wednesday of overstating the weight of some pre-packaged products sold in the company's stores in the city.

> Tests of 80 different pre-packaged products bought in the company's nine New York stores showed that all were labeled with erroneous weights, the department said.

> In one case, the department said consumers buying vegetable platters priced at $20 each were overcharged an average of $2.50. In another example, eight packages of chicken tenders priced at $9.99 a pound on average cost $4.13 more than they should have.

> John Hempfling, chief litigator for Whole Foods, said **the company had been working to address the city's concerns since December**, walking officials through its auditing and training programs and having them meet with regional executives.

> "They've never provided any evidence," Mr. Hempfling said. "**All I've seen from them is the violation sheets**."

> He said that made it hard for the grocer to assess the city's report.

> **Julie Menin, commissioner of the Department of Consumer Affairs, disputed that, saying that her agency met with Whole Foods in February, had repeated conversations with the company and had provided it with more than 90 pages of what she called "detailed violation data**."

> "We have repeatedly asked Whole Foods to provide us with evidence that they have fixed this problem – the same problem that existed in California and clearly exists in New York City," Ms. Menin said. "They have failed to do so, which is why we are continuing our investigation."

> \*       \*       \*

> [Hempfling] said the city had been doing its investigation in many New York City groceries and questioned why Whole Foods was the only grocer cited.

> Last year, Whole Foods paid an $800,000 fine in California after Santa Monica, Los Angeles and San Diego brought a civil protection case against the chain, accusing it of overcharging customers.

> Mr. Hempfling said the company planned to fight the fines sought by New York, however, because **they were "excessive**."

---

[15]   Hempfling acted on Whole Foods' behalf in the Company's litigation in California and signed the California Stipulation for Whole Foods. *See* ¶70.

The Department of Consumer Affairs said the fine in New York for falsely labeling a package was as much as $950 for the first violation and up to $1,700 for a subsequent violation.

99.     On June 29, 2015, defendants Robb and Mackey posted a video to the Company's website to admit and "own" the pricing issues identified by the DCA:

> Hi.  I'm Walter Robb, and together with John Mackey we serve as the co-CEO's of Whole Foods Market and ***we want to talk directly with you this morning about certain pricing issues you may have heard about*** in our New York City stores.  ***Straight up, we made some mistakes.  We want to own that*** and tell you what we're doing about it.

"A Message to Whole Foods Market Customers" posted with the video stated that:

> We are improving our training regarding in-store packaging, weighing and labeling processes.  Additionally, we have implemented a companywide third-party auditing process for all of our stores, and we will provide an update in the next 45 days so that customers can follow our progress.[16]

100.    On July 2, 2015, SunTrust Robinson Humphrey analysts issued a report titled "WFM Reacts to 'Thumb-on-Scale' Charges":

> ***Whole Foods Market, Inc. is in the news this morning . . . . with a surprising apology for inaccurate pricing in its NYC stores***.  This follows recent charges by NYC's Department of Consumer Affairs that WFM was overcharging customers based on weight discrepancies.
>
> ***After initially denying the claims, management decided to "come clean," presumably after conducting an internal investigation***.  The incorrect charges, according to the company, went "both ways" and only took place in a small portion of the assortment.  (We would also point out that WFM only has about 6 NYC stores which constitute 1.5% of the chain).  Along with the apology, management promised to tighten procedures chain-wide and follow up with periodic (and published) audits.

(Emphasis and alteration in original.)

101.    Also on July 2, 2015, *USA Today* published an article titled "Whole Foods execs apologize for overcharging," which discussed the apologetic video posted by Robb and Mackey on the Company's website and the DCA's reaction to it:

> Whole Foods executives apologized via a blog post and video this week after New York City's Department of Consumer Affairs alleged they had been routinely mislabeling packages with the wrong weights.

---

[16]    As of the date of the filing of this Complaint, plaintiff's counsel is not aware of any audit that has been provided to customers.

Whole Foods top executives said they "made some mistakes" in a video posted to the company's blog after an investigation in New York City claimed the high-end grocery chain consistently overcharges for pre-packaged food.

"Straight up, we made some mistakes, we want to own that," co-CEO Walter Robb said alongside co-CEO John Mackey.

\*   \*   \*

The New York City Department of Consumer Affairs released the results of an investigation on June 24 that alleged the area's Whole Foods stores had consistently listed improper weights on prepackaged food, resulting in overcharges from 80 cents to nearly $15 an item. . . .

\*   \*   \*

In the blog post, the company disputes the department's claims that it systematically overcharges customers. But said "we apologize to our customers for any discrepancies that may have occurred."

**_DCA Commissioner Julie Menin issued a statement saying her department is "gratified . . . Whole Foods is admitting the deficiencies in how they label their prepackaged foods_**." She also said the DCA "will remain vigilant and hold Whole Foods and other supermarkets accountable for any misleading and deceptive practices."

(Some alteration in original.)

102.    On July 6, 2015, *Forbes* published an article by Clark Wolf, which noted, in relevant part, that Whole Foods had been caught "**_[t]wice, on two coasts.  Record making overcharging_**."

The article continued:

I certainly **_do not_** believe there's a paragraph in the employee manual on how to overcharge. But I suspect the sort of care we seek is upended by pressure on managers and regionals to produce revenues and profits, save money, not spend too much on training – and a general experience of a strong customer base that really doesn't look at price too closely. I know I don't. When I go into an obviously expensive store I suspend disbelief a bit. The price/value war is on hold unless something really unacceptable pops into clear view. It's worth it to me; to feel the luxury of trust.

(Emphasis in original.)

<u>The Impact of Defendants' Systemic Overcharging of Customers on Whole Foods' Financial Condition Is Revealed</u>

103.    On July 29, 2015, after the market closed, Whole Foods issued a press release announcing its third quarter fiscal 2015 financial results for the third quarter ended July 5, 2015. The Company reported net income of $154 million, or $0.43 diluted EPS, sales of over $3.6 billion,

gross profit of over $1.2 billion and comps of 2.2%, comprised of 2.6% for the first ten weeks of the

quarter and 0.4% for the final two weeks of the quarter after the New York City DCA investigation

was revealed.  The financial results fell far below analyst revenue and earnings expectations due to

slow sales stemming from the overpricing charges.

104.    After releasing its third quarter fiscal 2015 financial results on July 29, 2015, Whole

Foods held a conference call for analysts, representatives and investors attended by defendants

Mackey, Robb, Lannon and Gallo during which defendants addressed the impact of the DCA's

accusation of overcharging consumers.  Defendant Robb remarkably claimed that as opposed to the

DCA's findings which the Company previously admitted to, that the issues were not systemic.

Rather than emphasizing the differentiating factors of Whole Foods, Robb conveniently stated that

these "weights and measures issues . . . can be found at any supermarket":

> [ROBB:]  ***Comps dropped sharply in week 11, after our New York City weights and measures audit received national media attention***, and averaged just 0.4% for the last two weeks of the quarter.  We have seen a slight improvement in trends fourth quarter to date; however, comps are still well below our 2.5% average for the 19 weeks prior to the negative publicity. . . .
>
> I want to take a moment to address the New York City weights and measures audit.  As soon as the New York City Department of Consumer Affairs came to us, we worked to understand and address the issues to prevent them from happening again.  ***I want to emphasize these were not systematic, but rather caused by inadvertent human error.  The audit includes errors that were favorable to customers as well.  These are weights and measures issues that can be found at any supermarket***.
>
> ***Clear and transparent pricing is integral to how we operate***.  We have taken immediate steps to address these issues, including improving our training regarding in-store packing, weighing, and labeling processes; and expanding our third-party auditing process Company-wide.  ***We've built our business on the core value of satisfying and delighting our customers; it is what our customers have grown to love and expect from us.  And our approach to pricing transparency is no different***.  If a price is not accurate and not priced in the customer's favor, then that item is free to the customer, no charge, no question.

105.    Following these revelations, securities analysts had many questions for defendants on

the call:

[ANALYST:] Walter, when you look at the slowdown over the past five weeks, how can you guys be so precise that the New York audit is the primary factor?  And I guess *more importantly, what steps are you taking to fix the problem* . . . .

[ROBB:] . . .  *And clearly it affected the comps.*  Clearly, there's other factors at work here too, in terms of the headwinds from the previous year's strong sales and so forth.  *But by any measure, it had significant impact on our sales.*

\*          \*          \*

[FLANAGAN:] *The impact was really felt across the whole country, not in New York City. This was national news*.  So looking at what is happening in the New York market is really not the right way to look at it.  It's looking at it across the whole Company . . . .

106.   As a result of these disclosures, Whole Foods stock declined $4.74 per share on very

heavy trading volume to close at $36.08 per share on July 30, 2015.

107.   On July 30, 2015, several analysts commented on the impact of this news on Whole

Foods' stock price, traffic and sales:

- A Deutsche Bank analyst emphasized "What Goes Around Comes Around," and stated that "[i]t is clear WFM's over-charging mishap negatively impacted traffic" and "[a]s a result, WFM is now faced with the arduous task of both regaining trust, while at the same time overcoming the 'Whole Paycheck' image."  The analyst noted that the "that the process of rebuilding trust with customers will take time and could act as a headwind for the next few quarters and, potentially, years."

- Analysts at Morgan Stanley attributed Whole Foods' decreased sales at the end of 3Q15 and the beginning of 4Q15 directly to the Company's overcharging in New York, stating that "[w]hat most had thought to be a fairly localized issue in the news recently, [the pricing audits] greatly impacted corporate comps."

- Analysts at Jefferies attributed Whole Foods' 3Q15 earnings miss to lower same store sales (comps) caused by Whole Foods' overcharging in New York, stating that "*[o]vercharging scandal in NY stalls comps*," and that "[a]fter posting a 2.6% comp for the first 10 weeks of 3Q, trends slowed abruptly on negative media coverage of a NY weights/measures audit showing that WFM was overcharging its consumers."

- SunTrust Robinson Humphrey analysts similarly attributed the precipitous drop in Whole Foods' stock price to the widespread overcharging in New York, stating that the "*[a] big portion of the shortfall evidently came from the pricing "scandal" in NYC in June . . . this factor alone seemed to cause comps to decelerate from 2.6% (the QTD run rate at that point) to 0.4% in the last two weeks of the period*.

108.   On August 4, 2015, despite agreeing to the June 2014 Judgment requiring Whole

Foods to obey each of the California pricing and weights and measures laws claimed to have been

violated and to institute a comprehensive, detailed statewide compliance program at each of their nearly 80 California stores "to promote pricing accuracy" and ensure compliance with the injunction, Whole Foods sought *ex parte* relief from the Superior Court for Los Angeles County regarding the construction of the Judgment because "[v]arious counties have and continue to impose administrative penalties on Whole Foods" since entry of Judgment.[17]   Stated differently, **Whole Foods has continued to commit weights and measures violations in California** and its so-called "compliance program" has failed to prevent such violations.[18]   Notably, in response to Whole Foods' characterization of these continued violations as human error "one-offs" during the October Hearing, a Deputy City Attorney for Los Angeles explained:

> [I]t's not so black and white as either a conspiracy and systemic intentional problem versus just harmless human error.  It's mostly in between.  And it's mostly they are high volume.  ***This case was based on a high volume of errors that occurred over and over and over and weren't fixed.  And the company knew about them and didn't fix them***.[19]

---

[17]   *See People of the State of Cal. v. Whole Foods Mkt. Cal., Inc.*, No. SC122679, Memorandum of Points and Authorities in Support of *Ex Parte* Application for an Order Shortening Time for Hearing on Defendants' Amended Application for Further Order and Direction for the Construction and Carrying out of the Final Judgment and Permanent Injunction Pursuant to Stipulation (Cal. Super. Ct. L.A. Cty. Aug. 4, 2015), Ex. 7, attached hereto.  During an October 16, 2015 hearing in the *California* Action, Whole Foods' counsel acknowledged that "in addition to [a] criminal [misdemeanor action,] there have been administrative hearings.  *Many of them*." *People of the State of Cal. v. Whole Foods Mkt. Cal., Inc.*, No. SC122679, Reporter's Transcript of Proceedings (Cal. Super. Ct. L.A. Cty. Oct. 16, 2015) (the "October Hearing") at 4:2-8, Ex. 8, attached hereto.  In fact, the Deputy City Attorney for Los Angeles noted at the same hearing that due to the limited number of inspectors and that "they get to each store probably not even once a year," "*the actual violations they find are the ultimate tip of the iceberg*" given there are "thousands and often hundreds of thousands, millions of individual items that get scanned and bought each day." *Id.* at 24:16-25:5.

[18]   Whole Foods took the position in the *California* Action that the Judgment allows Whole Foods to avoid any legal repercussions for legal violations that are discovered during the 5-year period, so long as the violations are corrected within 15 days.  In short, Whole Foods acknowledged (at least implicitly) it continued to violate the injunction – and that its compliance program failed to prevent such violations – but it cannot be punished for doing so.  The court recently amended the final judgment and permanent injunction, to foreclose Whole Foods' argument that it is immunized from prosecution for violations occurring after the date of the final judgment.  The court observed that "[i]mmunizing Whole Foods from any penalty or liability for violations . . . is in contravention of California's public policy in favor of consumer protection.  July 14, 2016 Minute Order at 8.

[19]   October Hearing at 34:5-11.  Whole Foods' counsel again strained to characterize "10 or 12 or so" "administrative hearings" as "isolated" "one-offs." *Id.* at 42:8-14.

109.    Whole Foods' sales and revenue continued to lag following the pricing scandal and revelations that the Company routinely overcharged customers.   On November 4, 2015, the Company announced quarterly results for the fourth quarter, which spanned July 6, 2015 – just a week after the DCA investigation was announced – through September 27, 2015, acknowledging the need to "[r]ebuild sales" and that comparable store sales on a constant currency basis had declined. Defendant Robb stated that "[w]e recognize the need to move faster and go deeper to **rebuild traffic and sales** and create a solid foundation for long-term profitable growth and are taking the necessary steps to better communicate our differentiation, improve our value perception, and fundamentally evolve our business."

110.    During the conference call later in the day on November 4, 2015, defendant Mackey outlined the Company's new nine-point plan to rebuild sales momentum and acknowledged "that we recognize we have our work cut out for us.  We believe we are taking the necessary steps to regain our sales momentum, fundamentally evolve our business model, and produce the returns that the investment community expects from us, and that we expect from ourselves."  On this disclosure, the price of Whole Foods common stock declined $1.16 between November 3, 2015 and November 5, 2015 on very heavy trading volume.

111.    On December 28, 2015, after the market closed, the New York City DCA announced that Whole Foods agreed to pay $500,000 to settle DCA's claims that the Company mislabeled pre-packaged foods in its New York City stores.  In addition to the monetary payment, the agreement also required Whole Foods to conduct quarterly in-store audits of at least 50 products from 10 different departments at all New York City stores, and to correct all inaccuracies.  The agreement required Whole Foods to implement and enforce policies and procedures that forbid employees from merely estimating the weight of a package, and to conduct training for all New York City employees responsible for weighing and labeling pre-packaged foods.  Further, if the City's auditors found

- 55 -

labeling errors in follow-up inspections, the store must remove all mislabeled products, and all New York City stores must verify the pricing accuracy of that product and 20 additional products from the same department, within 15 days.

112.     Announcing the settlement, DCA Commissioner Julie Menin stated, "'After discovering the **troubling and repeated mislabeling of pre-packaged foods at Whole Foods** last year, we are happy to have reached an agreement with Whole Foods that will help to ensure New Yorkers are better protected from overcharging.'"  Ever on the defensive, Whole Foods responded, stating that DCA "misrepresented" the agreement and that there was "no evidence of systematic or intentional misconduct."

113.     During a May 4, 2016 conference call to discuss the Company's financial results for the 2Q16, defendants anticipated an improvement in same-store sales comparisons once they reached the "anniversary" of the DCA's disclosure of its investigation:

> Secondly, as we get into the very end of this quarter, we will anniversary the weights and measures audit that happened to us in New York City that went national and definitely took a tremendous amount of sales from Whole Foods Market.  So when that happens in week 11 of this quarter, we will begin to compare against that. That's going to be a very positive – that's going to have a very positive effect on our comps.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS ARE MATERIAL AND OMITTED MATERIAL INFORMATION**

114.     Throughout the Class Period, defendants repeatedly emphasized that Whole Foods was the industry leader in "quality and transparency" and because of these traits the Company earned its customers' trust and was "different and better" than its competitors.  Defendants further stressed that lowering prices, *i.e.*, increasing value through price investments, was a "key element in driving sales growth over the long-term," as lower prices would bring in new customers and increase sales. For example:

- Mackey: "We have mentioned value [*i.e.*, pricing] several times today, which is certainly important as we seek to appeal to a broader customer base."  May 6, 2014 conference call.

- Robb: "Natural and organic products are increasingly available, but no one does what we do.  Our brand and our marketing campaign will highlight both our value and our values, reinforcing our leadership around quality and transparency in the marketplace."  July 30, 2014 conference call.

- Robb: "[I]n fact people do trust us.  They trust us for the quality that we offer.  And that is a currency of building relationships with customers in the 21st century . . . ."  February 27, 2015 conference call.

- Robb: "[W]e're going to be relevant on the price areas that we need to be.  But we are going to focus on building a new race to the top, because we think this marketplace is just opening up in ways we never imagined, that we're going to concentrate in building that new top for this industry: new levels of quality, new levels of transparency, new levels of accountability across the entire business."  February 27, 2015 conference call.

- Mackey: "We have narrowed the price gap versus our competitors on known value items to its narrowest margin yet while continuing to raise the bar even higher on our standards of transparency."  November 6, 2013 conference call.

115.     Unsurprisingly, analysts and investors found defendants' statements regarding Whole Foods' transparency, quality and commitment to offering value (*i.e.*, lower prices) material to their decision making.

116.     After Whole Foods' Investor Day, analysts at Morgan Stanley saw increased transparency with customers and investors as instrumental to Whole Foods' success:

> *Whole Foods is increasing transparency with both investors and customers, which we believe is the right strategy for sustained loyalty to WFM long-term*.

117.     Analysts at Stern Agee agreed, stating:

> Whole Foods continues to take the approach that it is not participating in a race to the bottom, *but instead is looking to create a new race* to the top in terms of new levels of product (i) quality, (ii) *transparency*, and (iii) *accountability*. . . .  *As a result, shoppers trust each and every item in the store* – a huge advantage for the company, particularly as more U.S. households look to eat healthier.

118.     Following Whole Foods' announcement of its "Values Matter" advertising campaign, one analyst wrote that, in light of increasing competition, the Company's campaign would "emphasiz[e] how Whole Foods is different from other grocers in terms of its quality [and] transparency."  ¶78.

119.     Defendants directly linked transparency to pricing accuracy and reaffirmed Whole Foods' transparency and quality as the driving force behind customer trust.  Following its settlement

- 57 -

with California regulators for overcharging customers across the state, Whole Foods issued an

apology, stating:

> **[We are] well aware that any violation of [your] trust** – however unintentional – **can impact your feelings about shopping in our stores**.  We take our obligations to you very seriously and **we always strive for transparency and accuracy in everything we do**.

120.    In the 3Q15 conference call following the New York DCA's announcement of

systemic overcharging at Whole Foods' New York City stores, defendant Robb echoed the

Company's apology after the California overcharging:

> [Robb:]  **Clear and transparent pricing is integral to how we operate**. . . . We've built our business on the core value of satisfying and delighting our customers; it is what our customers have grown to love and expect from us.  And our approach to pricing transparency is no different.

121.    When Whole Foods' overcharging and its impact on sales was disclosed, exposing the

falsity of, among others, defendants' claims to transparency, value and lower prices, investors

reacted swiftly and negatively to this new information and the price of Whole Foods shares collapsed

$4.74 per share to close at $36.08.

## DEFENDANTS' PURPORTED RISK DISCLOSURES ARE INSUFFICIENT TO SHIELD THEM FROM LIABILITY FOR THEIR FALSE AND MISLEADING STATEMENTS AND OMISSIONS

122.    Throughout the Class Period, defendants purported to warn investors that the

Company could be subject to adverse or negative publicity could harm the Company's business.

These warnings, or virtually identical versions, appeared in each of the Company's Forms 10-K filed

with the SEC during the Class Period:

> *Adverse publicity may reduce our brand value and negatively impact our business.*
>
> We believe our Company has built an excellent reputation as a food retailer, socially responsible corporation and employer, and we believe our continued success depends on our ability to preserve, grow and leverage the value of our brand.  Brand value is based in large part on perceptions of subjective qualities, and even isolated incidents can erode trust and confidence, particularly if they result in adverse publicity, governmental investigations or litigation, which can negatively impact these perceptions and our business.

123.    These warnings were directed at market and external risks, *i.e.*, factors beyond

defendants' control, such as food safety.  Moreover, to the extent that the warnings related to

- 58 -

defendants' belief that the Company was socially responsible, for example, as alleged herein defendants knew but failed to disclose that Whole Foods was systemically mispricing or overcharging pre-packaged items purchased by its customers and that its disclosure and internal controls were inadequate to prevent such overcharging.  These omissions rendered the purported warnings independently and materially false and misleading.  And, nowhere did the Company warn investors that it might repeatedly and systemically misweigh food items and overcharge its customers from California to New York and be subjected to fines and regulatory investigations which together, as its customers and shareholders learned about the misconduct, would cause traffic in its stores to collapse and revenues and profit metrics to decline.

## WHOLE FOODS' FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP AND SEC DISCLOSURE RULES

124.    Defendants caused the Company to falsify its financial results reported in its public financial statements for 3Q13, 4Q13/FY13, 1Q14, 2Q14, 3Q14, 4Q14/FY14, 1Q15 and 2Q15 by artificially inflating revenues in violation of GAAP and SEC rules resulting in the artificial inflation of the Company's stock price.[20]  These GAAP violations resulted in the overstatement of the Company's sales, gross profit, net income and EPS.[21]

---

[20]    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).  On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a Replacement of FASB Statement No. 162*.  FASB Accounting Standards Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.  The ASC did not change existing GAAP.

[21]    Whole Foods' financial statements issued during the Class Period were included in Forms 10-Q and Forms 10-K filed with the SEC specifically, albeit falsely stating that the financial statements were prepared in accordance with GAAP.  Defendants Mackey, Robb and Flanagan also certified that the Company's financial statements did not contain untrue statements of material fact.  The

125.     As detailed herein, defendants' financial statements were issued in violation of GAAP and SEC rules, where defendants misstated revenue in cases where pre-packaged foods were mispriced/overpriced.  As revealed by the California and New York investigations, Whole Foods routinely overweighed its pre-packaged foods, including failing to deduct the tare weight when selling pre-packaged items, resulting in its customers being overcharged.  *See* ¶¶69-70.  As specifically revealed in the New York investigation, these overcharges ranged from $0.80 for a package of pecan panko to $14.84 for a package of coconut shrimp.  ¶96.  The issue was not isolated – the overcharging scheme affected the same products at multiple stores.  The findings, as described by regulatory agencies, revealed a systemic problem with how products packaged for sale at Whole Foods were being weighed and labeled.  As a result of the overcharges, Whole Foods improperly inflated revenues in violation of GAAP, which also resulted in overstatements of net income, EPS and gross profits.

126.     SEC Staff Accounting Bulletin ("SAB") Topic 13: Revenue Recognition,[22] §A1, sets forth several criteria that must all be met before revenue may be recognized, including that: the seller's price to the buyer is fixed or determinable; collectability of the sales price is reasonably assured; delivery has occurred or services have been rendered; and persuasive evidence of an arrangement between the Company and the customer must exist:

> The staff believes that revenue generally is realized or realizable and earned when all of the following criteria are met:

---

Class Period financial statements, however, falsely reported total sales due to the Company's overcharging of customers by overstating the weights of its pre-packaged products.  As a result, Whole Foods' financial statements were not prepared in accordance with GAAP for all the reasons detailed herein.

[22]   SAB Topic 13 represents the codification of certain Staff Accounting Bulletins, including SAB No. 101 – Revenue Recognition in Financial Statements as of May 9, 2003.  On December 17, 2003, SAB Topic 13 was revised by SAB No. 104: Revenue Recognition.  Such revisions, have been incorporated in all references to SAB Topic 13.  FASB incorporated the guidance from SAB Topic 13 into its codification at ASC 605-10-S99.

- Persuasive evidence of an arrangement exists [FN3 with the term "arrangement" meaning "***the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction***"];

- Delivery has occurred or services have been rendered;

- The seller's price to the buyer is fixed or determinable; and

- Collectability is reasonably assured.

SAB Topic 13, §A1, ASC 605-10-S99-1.

127.     In addition, Whole Foods violated the overarching accounting principle that revenues and gains should not be recognized in financial statements until they are both earned and realizable (ASC 605-10-25-1, referencing FASB Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises,* ¶83(a)-(b)):

(a)     "Revenues and gains generally are not recognized until realized or realizable. Revenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash.  Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash." ASC 605-10-25-1; and

(b)     "Revenues are not recognized until earned.  An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and ***revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues***."  ASC 605-10-25-1.

128.     More specifically, on September 22, 2015, and again on October 19, 2015, as part of the New York Litigation which was initially filed in the New York State Supreme Court, Whole Foods filed the two Moll affidavits based upon the Company's corporate transaction records and the DCA's notices of violation sheets, attempting to estimate and quantify its overcharging of customers who purchased pre-packaged packages of meat, dairy and baked goods over a three year period,

- 61 -

from June 25, 2012 to June 25, 2015 (the "Relevant Period"). The Moll affidavits detailed certain of the financial data available to the Company in order to estimate the financial impact of the overpricing, including the description of pre-packaged foods affected, the net unit sales of those products, and the net dollars generated by those sales. *See* Ex. 2, ¶¶5, 7-8, Ex. A; Ex. 3, ¶¶3-5, 7, Ex. A. Based on this data, Whole Foods quantified a minimum amount of overcharges in excess of $9 million for the State of New York alone.[23] Whole Foods acknowledged that its calculations were based on a "very conservative analysis," meaning the amounts could be much higher. Ex. 4 at 2.

129.    Moll further acknowledged that the claims in that case "ar[o]se from a June 2015 press release that the . . . DCA issued in connection with an ongoing weights and measures investigation involving a number of packages of various food products sold at certain Whole Foods stores located in New York City." Ex. 2, ¶3. Moll explained in detail the following and described the process by which Whole Foods employees calculated the amount of overcharges in New York for the Relevant Period:

- reviewed the notices of violation issued by the DCA to Whole Foods, in which the agency identified the different types of product packages of which DCA stated it examined during its investigation of Whole Foods (Ex. 2, ¶5; Ex. 3, ¶¶3-4);

- reviewed Whole Foods' sales records in an effort to identify and list the products which Whole Foods understands are the products referred to in the DCA press release and the notices of violation ("the Subject Products") (Ex. 2, ¶6; Ex. 3, ¶4);

- isolated the subset of the Subject Products in the meats, dairy and baked goods categories, as plaintiff in the New York Litigation claimed to have purchased products in these categories (Ex. 2, ¶¶4, 7; Ex. 3, ¶5);

- based on records maintained by Whole Foods in the ordinary course of business, determined the net units of Subject Products in the meat, dairy and baked goods categories sold during the Relevant Period, and total net dollar sales for these products (Ex. 2, ¶¶8-9, 14; Ex. 3, ¶¶7, 14);

- based on the above-described analysis, prepared a summary exhibit showing 16,577,661.99 net units sold during the Relevant Period, from which Whole

---

[23]    *See Bassolino v. Whole Foods Market Group, Inc.*, No. 1:15-cv-06046-PAE (S.D.N.Y.), letter to the Honorable Paul A. Engelmayer, United States District Judge attached hereto as Ex. 4.

Foods reaped $117,722,888.01 in net sales, as shown below (Ex. 2, ¶¶9-10, Ex. A; Ex. 3, Ex. A):

| DESCRIPTION | STATE | NET DOLLAR SALES | NET UNIT SALES |
|---|---|---|---|
| Apple Raisin Strudel | NY | $153,926.51 | 15,410.44 |
| Cheese | NY | $85,917,124.04 | 11,023,391.24 |
| Cheese Plate | NY | $99,219.14 | 4,865.81 |
| Chicken Legs | NY | $2,579,284.90 | 601,891.40 |
| Chicken Thighs | NY | $6,626,290.95 | 1,580,344.81 |
| Chocolate Cupcakes | NY | $773,710.34 | 225,690.33 |
| Ground Beef | NY | $17,437,754.74 | 2,314,975.49 |
| Pumpkin Pie | NY | $787,329.29 | 158,583.17 |
| Red Leicester | NY | $21,102.70 | 800.49 |
| Rotisserie Chicken Half | NY | $1,003,716.63 | 174,614.30 |
| Split Chicken Breasts | NY | $1,646,876.81 | 380,566.83 |
| Value Vanilla Cake 9" | NY | $8,949.98 | 447.50 |
| Vegan Cupcakes | NY | $143,157.41 | 40,522.35 |
| Wing Bucket | NY | $524,444.57 | 55,557.84 |
| **TOTALS** | | **$117,722,888.01** | **16,577,661.99** |

- further reviewed transaction data to determine that there were 75,768,569 unique purchase transactions at Whole Foods stores located in New York State during the Relevant Period (Ex. 2, ¶13).

130.    Using the facts attested to in the Moll affidavits describing the impact of the overcharging if the allegations in the New York Litigation were accepted as true, plaintiff here has estimated that for the states of New York and California (states in which the Company has been fined for overcharging), Whole Foods, from June 25, 2012 to June 25, 2015, overcharged customers by $127.7 million, as depicted in the chart below.  As a result, and extrapolating from Whole Foods' reports, and accepting plaintiff's allegations as true, Whole Foods overstated revenues by $127.7 million from June 2012 to June 2015, as these revenues had not been "earned," in violation of revenue recognition principles under GAAP.[24]   The overstatement of revenues also resulted in overstatements of net income and EPS.

---

[24]    *See* ASC 605-10-25-1.

| Overcharge Estimate for New York and California | | |
|---|---|---|
| Total Net Unit Sales for 14 products in meat, dairy, baked goods category | | 16,577,662 |
| Minimum $0.80/Package Overcharge | | $ 0.80 |
| Overcharge Estimate for New York | **A** | $ 13,262,130 |
| Cheese Adjustment [25, 26] | **B** | $ 8,818,713 |
| Total Overcharge Estimate for New York | **A+B** | $ 22,080,843 |
| 89% error rate for overweight violations beyond federal standards for the maximum amount that an individual package can deviate from the actual weight | | 0.89 |
| Adjusted Overcharge Estimate for New York | **C** | **$ 19,651,950** |
| 5.5 times adjustment for California Overcharge[27] | | 5.50 |
| Total Overcharge Estimate for California | **D** | **$ 108,085,724** |
| **Total Overcharge for New York and California** | **C+D** | **$ 127,737,674** |

131.    The assumptions herein are a conservative estimate of overcharges (and corresponding overstatement of revenue).  Based on the Moll affidavits and representations to the SDNY court in the New York Litigation, and the broad scope of the alleged violations, the actual

---

[25]    In the New York Litigation, Whole Foods represented that "[t]he 'unit' of measurement of cheese is typically one pound," but explained that one pound of cheese is typically cut into individually-wrapped packages of cheese that weigh, on average, one-third to one-half pound. "[U]sing net unit sales of cheese as a check on the analysis based on number of transactions," Whole Foods estimated that the potential overstatement "would be in the range of two to three times higher than $8,818,712.80."  *See* Ex. 4 at 3.

[26]

| Cheese Adjustment | |
|---|---|
| Total Net Unit Sales for Cheese | 11,023,391.24 |
| Minimum $0.80/Package Overcharge | $ 0.80 |
| Cheese Overcharge Estimate for New York | $ 8,818,713 |
| 2.0 times adjustment for Cheese Overcharge in New York | 2.00 |
| **Actual Cheese Overcharge** | **$ 17,637,426** |

[27]    Per Whole Foods FY12 Form 10-K, California had approximately 5.75 times as many stores as New York with California having 69 stores and New York having 12 stores.  Per Whole Foods FY13 Form 10-K, California had approximately 6 times as many stores as New York with California having 73 stores and New York having 12 stores.  Per Whole Foods FY14 Form 10-K, California had approximately 5 times as many stores as New York with California having 76 stores and New York having 15 stores.  Plaintiff has chosen a 5.5 times adjustment to estimate the total overcharge estimate for California.

- 64 -

amount of overcharges is likely significantly larger.  Some of the conservative assumptions plaintiff

has made include the following:

- In total, the DCA identified 80 different types of pre-packaged products having mislabeled weights, yet plaintiff's estimate is based on only 14 products having mislabeled weights.  This is due to Whole Foods providing net units sales for only 14 pre-packaged products in the meat, dairy and baked goods categories as part of the New York Litigation.

- Plaintiff's estimate is limited to only New York and California.

- Plaintiff used only an $0.80 overcharge per net unit sold even though the DCA investigation stated the overcharges ranged from $0.80 to $14.84.

- Plaintiff multiplied the overcharge for cheese by a factor of two even though Whole Foods stated in the New York Litigation that the potential damage figure (*i.e.*, overcharges) would be in the range of two to three times higher.

132.    By overcharging customers on its pre-packaged foods, Whole Foods had not "earned"

or "realized" the full amount of revenues the Company was recognizing because the inaccurate

weighing led to customer overcharges which inflated sales in violation of GAAP and SEC rules.

This GAAP violation of basic revenue recognition principles resulted in false financial statements

issued during the Class Period that materially overstated sales, gross profits, net income and EPS.

133.    Defendants' systemic overcharging of its customers and improper inflation of

reported sales, gross profits, net income and EPS also resulted in the Company violating SEC

Regulation S-K Item 303, 17 C.F.R. §229.303.  SEC Regulation S-K Item 303 requires a discussion

of results of operations and other information that the registrant believes to be necessary to an

understanding of its financial condition, changes in financial condition and results of operations.

Regulation S-K Item 303 requires a company to disclose "any known trends or uncertainties that

have had or that the registrant reasonably expects will have a material favorable or unfavorable

impact on net sales or revenues or income from continuing operations."   17 C.F.R.

§229.303(a)(3)(ii).  In violation of Regulation S-K Item 303, Whole Foods failed to disclose its

improper practice of overpricing or mispricing pre-packaged foods, which was materially overstating

sales and would lead to an unfavorable trend for the Company on ongoing sales due to a lack of trust with their customers.

134.   Defendants' false and misleading Class Period financial statements, and their misleading omissions regarding Whole Foods' accounting for sales were unquestionably material. *SEC Codification of Staff Accounting Bulletins Topic 1-M* ,"Materiality" ("SEC Topic 1-M"), states that "[a] matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative as well as quantitative considerations.  SEC Topic 1-M notes that assessing materiality solely on a quantitative basis "has no basis in the accounting literature or the law."  It notes that the Financial Accounting Standards Board "has long emphasized that materiality cannot be reduced to a numerical formula."

135.   While no finite quantitative tolerance level exists within GAAP to determine when a misstatement is quantitatively material, SEC Topic 1-M provides a benchmark threshold of 5% of a financial statement item (*i.e.*, net income, EPS) as a potential indicator of materiality.  However, SEC Topic 1-M states evaluating the quantitative magnitude of a misstatement is only the "beginning of an analysis of materiality."

136.   It further identifies certain qualitative considerations that might render financial statements to be misstated, even when the related amounts at issue were quantitatively small.  For example, if a misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.  Further, whether the misstatement concerns a portion of the registrant's business that has been identified as playing a significant role in the registrant's operations and profitability should be considered in determining materiality.  Finally, whether the ***misstatement affects the registrant's compliance with regulatory requirements*** should also be considered in evaluating materiality or whether the ***misstatement involves concealment of an unlawful transaction*** should also be considered in evaluating materiality.

137.   Under these guidelines, Whole Foods' overstatement of revenues, by overcharging its customers, was both quantitatively and qualitatively material.  First, based on plaintiff's estimate at ¶¶130-131, Whole Foods overstated revenues by $127.7 million, net income by $79.2 million and

diluted EPS by $0.24.[28]  As seen in the chart below, the $127.7 million overstatement of revenues also caused a 4.8% overstatement of net income and a 4.4% overstatement of diluted EPS:[29]

|  | Reported Amount from 7/2/2012 – 7/5/2015[30] | Adjusted Amount from 7/2/2012 – 7/5/2015 | Percentage of Overstatement |
|---|---|---|---|
| Net Income | $1.722 billion | $1.643 billion | 4.8% |
| Diluted EPS | $5.73 | $5.49 | 4.4% |

138.    The overstatement was also qualitatively material under SEC Topic 1-M because the overstatement caused a significant negative reaction to Whole Foods' current and future business. Further, because the Company's pre-packaged perishable items comprised two thirds of the Company's sales, the overstatement impacted a portion of Whole Foods' business that played a significant role in its operations and profitability.  Finally, the California and New York violations disclosed that Whole Foods was not complying with New York and California State regulatory requirements and involved concealment of unlawful transactions.  Accordingly, Whole Foods' Class Period figures and financial reporting were materially misstated under GAAP and SEC rules.

## LOSS CAUSATION/ECONOMIC LOSS

139.    Plaintiff incorporates by reference ¶¶52-138 set forth above.

140.    During the Class Period, as detailed herein, defendants issued false and misleading statements concerning the current and future financial condition of the Company and engaged in a scheme to deceive investors regarding the same.  Specifically, the Company misstated its financial results for each of the reporting periods alleged herein and facts concerning the Company's overall transparency, pricing of its products, and high standards of business practices and its internal

---

[28]    Plaintiff estimated a 38% tax rate and 323.5 million weighted average shares outstanding on a diluted basis in determining net income and EPS impact.

[29]    As discussed at ¶131, plaintiff's estimate utilizes multiple conservative assumptions, which indicates the actual amount of overstated revenues, net income and diluted EPS is likely significantly larger.

[30]    Plaintiff used Whole Foods' quarterly reporting periods from 4Q12 to 3Q15 to approximate the relevant period of the New York Litigation, June 25, 2012 to June 25, 2015.  The first day of 4Q12 was July 2, 2012 and the last day of 3Q15 was July 5, 2015.

1187606_1

controls while failing to disclose that, in truth, the Company routinely overcharged customers for its pre-packaged foods resulting in false financial reports including revenue and income in violation of GAAP and/or SEC disclosure rules.

141.     Defendants' false and misleading statements caused Whole Foods' stock to trade at artificially inflated prices throughout the Class Period as high as $62.20 per share on October 21, 2013.

142.     Later, when the relevant truth regarding the financial impact of the Company's wrongdoing alleged herein was revealed, Whole Foods' stock price declined, as the prior artificial inflation came out of the stock price.

143.     Specifically, on June 24, 2015, the New York City DCA announced it had uncovered "widespread problem[s]" of "[s]ystemic overcharging for [p]re-[p]ackaged [f]oods" at Whole Foods' eight New York City locations.

144.     On July 29, 2015, Whole Foods reported financial results for the third quarter ended July 5, 2015, disclosing the impact of the Company's widespread overcharging practices revealed on June 24, 2015 on the Company's financial condition, including a substantial miss in revenue and earnings expectations and a sharp decline in one of its key reporting metrics, comparable store sales.

145.     Investor reaction to the disclosure of this new financial information was sharp and swift as the price of Whole Foods common stock declined $4.74 per share on high trading volume of over 35 million shares on July 30, 2015 to close at $36.08 per share on July 30, 2015.

146.     On July 30, 2015, SunTrust Robinson Humphrey published a reported titled, "WFM Reacts to 3Q Comp Light Reset Numbers," directly attributing the stock price decline to the disappointing financial results and the disclosures widespread overcharging in New York:

> *The market treated this [earnings] news rather harshly*, *sending the shares down 10%-11% in after market trading*. We understand the frustration.

- 68 -

*A big portion of the shortfall evidently came from the pricing "scandal" in NYC in June . . . this factor alone seemed to cause comps to decelerate from 2.6% (the QTD run rate at that point) to 0.4% in the last two weeks of the period*.

147.     The price decline in Whole Foods' stock described above removed the artificial inflation from Whole Foods' common stock, causing real economic loss to investors who transacted in Whole Foods' common stock during the Class Period and was the direct result of the nature and extent of defendants' prior false statements and material omissions and their impact being revealed to the market.

148.     The timing and magnitude of the declines in price of Whole Foods' common stock negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to defendants' fraudulent conduct.

149.     Like other members of the class of purchasers of Whole Foods stock who purchased at artificially inflated prices during the Class Period, plaintiff suffered an economic loss, *i.e.*, damages, when Whole Foods' stock prices declined upon the disclosures correcting the alleged misrepresentations and omissions.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET

150.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

151.     Plaintiff and the Class are also entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for Whole Foods stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)     Whole Foods stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)      Whole Foods stock traded on large weekly volumes and millions of shares were available for arbitrage activity;

(c)      As a regulated issuer, Whole Foods filed periodic public reports with the SEC and NASDAQ;

(d)      Whole Foods regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)      Whole Foods was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

152.    As a result of the foregoing, the market for Whole Foods stock promptly incorporated current information regarding Whole Foods from publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all those who transacted in Whole Foods stock during the Class Period suffered similar injury through their transactions in Whole Foods stock at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

153.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Whole Foods stock during the Class Period (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

154.    The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  Whole Foods stock was actively traded on NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Whole Foods or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  While the exact number of Class members is unknown to Plaintiff, Whole Foods reported 1,343 shareholders of record[31] as of November 11, 2015 and more than 350 million shares of stock were outstanding during the Class Period.  Accordingly, plaintiff reasonably believes that there are thousands of members in the proposed Class.

155.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

156.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

157.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether defendants' acts as alleged herein violated the federal securities laws;

(b)    Whether defendants' statements made to the investing public misrepresented or omitted material facts about Whole Foods' business, operations and financial conditions;

(c)    Whether the price of Whole Foods stock was artificially inflated during the Class Period; and

---

[31]    This figure does not include the many Whole Foods investors whose WFM stock is held in brokerage or similar accounts.

(d)     To what extent the Class members have sustained damages and the proper measure of damages.

158.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

159.    Plaintiff incorporates ¶¶1-158 by reference.

160.    Defendants are liable for making false statements and failing to disclose adverse facts known to them about Whole Foods.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on those who transacted in Whole Foods stock during the Class Period was a success, as it: (i) deceived the investing public regarding Whole Foods' business and financial condition; (ii) artificially inflated the price of Whole Foods stock; and (iii) caused plaintiff and other Class members to transact in Whole Foods stock at inflated prices.

161.    During the Class Period, defendants participated in the preparation of and/or caused to be disseminated the false or misleading statements specified above, which they knew or recklessly disregarded were materially false or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

162.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

- 72 -

(b)      Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their transactions in Whole Foods stock during the Class Period.

163.      Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Whole Foods' business, operations and financial condition as specified herein.

164.      The defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and financial status, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon those who transacted in Whole Foods stock during the Class Period.

165.      The defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Whole Foods' operating condition and financial status from the investing public and supporting the artificially inflated price of its common stock.

166.    As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Whole Foods stock was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of the Company's stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in defendants' public statements during the Class Period, plaintiff and the other Class members acquired Whole Foods stock during the Class Period at artificially high prices and were ultimately damaged thereby.

167.    At the time of said misrepresentations and omissions, plaintiff and other Class members were ignorant of their falsity, and believed them to be true.  Had plaintiff and other Class members and the marketplace known the truth regarding the problems that Whole Foods was experiencing, which defendants did not disclose, plaintiff and other Class members would not have transacted in Whole Foods stock, or, if they had transacted in its common stock during the Class Period, would not have done so at the artificially inflated prices which they paid.

168.    By reason of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5.

169.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other Class members suffered damages in connection with their Class Period transactions in Whole Foods stock.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

170.    Plaintiff incorporates ¶¶1-169 by reference.

- 74 -

171.    The Individual Defendants acted as controlling persons of Whole Foods within the meaning of §20(a) of the Exchange Act:

(a)    By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading;

(b)    The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

(c)    Because of their positions as co-CEOs, CFO, COO and Executive VPs of Operations, the Individual Defendants directly participated in the Company's management and were directly involved in Whole Foods' day-to-day operations.  The Individual Defendants also controlled the contents of Whole Foods' quarterly reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public.  The Individual Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

172.    By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.       Declaring that defendants are liable pursuant to the Exchange Act;

B.       Determining and certifying that this action is a proper class action and certifying plaintiff as a class representative and plaintiff's counsel as class counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

C.       Awarding compensatory damages in favor of plaintiff and the Class against defendants, jointly and severally, for damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial;

D.       Awarding plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

E.       Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 19, 2016                    ROBBINS GELLER RUDMAN
                                                           & DOWD LLP
                                            SHAWN A. WILLIAMS
                                            JOHN H. GEORGE

                                                                          s/ Shawn A. Williams
                                                 SHAWN A. WILLIAMS

                                            Post Montgomery Center
                                            One Montgomery Street, Suite 1800
                                            San Francisco, CA  94104
                                            Telephone:  415/288-4545
                                            415/288-4534 (fax)

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            DANIELLE S. MYERS
                                            SUSANNAH R. CONN
                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)

Lead Counsel for Plaintiff

KENDALL LAW GROUP, LLP
JOE KENDALL (State Bar No. 11260700)
JAMIE J. McKEY (State Bar No. 24045262
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com
jmckey@kendalllawgroup.com


Liaison Counsel

PRICE OKAMOTO HIMENO
  LUM
WARREN PRICE, III
ROBERT A. MARKS
728 Ocean View Center
707 Richards Street
Honolulu, HI  96813
Telephone:  808/538-1113
808/533-0549 (fax)


Additional Counsel for Plaintiff

- 77 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 19, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 19, 2016.

 s/ Shawn A. Williams               

SHAWN A. WILLIAMS
ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: shawnw@rgrdlaw.com

# Mailing Information for a Case 1:15-cv-00681-LY Markman v. Whole Foods Market Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Susannah R. Conn**
  sconn@rgrdlaw.com,jillk@rgrdlaw.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com,mzehel@pomlaw.com

- **Sammy Ford , IV**
  sford@azalaw.com,jrubin@azalaw.com,kleiker@azalaw.com

- **John H. George**
  jgeorge@rgrdlaw.com,smorris@rgrdlaw.com,fileroomsf@rgrdlaw.com

- **J. Alexander Hood**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com

- **Robert A. Marks**
  ram@pohlhawaii.com,jtam@pohlhawaii.com,sokamoto@pohlhawaii.com

- **Jamie Jean McKey**
  jmckey@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,schateauneuf@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Warren Price , III**
  wprice@pohlhawaii.com,jtam@pohlhawaii.com,sokamoto@pohlhawaii.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,smorris@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)