# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————————

No. 17-50840

———————————————

D.C. Docket No. 1:15-CV-681

United States Court of Appeals
Fifth Circuit

**FILED**

October 3, 2018

Lyle W. Cayce
Clerk

EMPLOYEES' RETIREMENT SYSTEM OF THE STATE OF HAWAII,

> Plaintiff - Appellant

v.

WHOLE FOODS MARKET, INCORPORATED; JOHN P. MACKEY; GLENDA JANE FLANAGAN; WALTER E. ROBB; A. C. GALLO; DAVID LANNON; KENNETH J. MEYER,

> Defendants - Appellees

Appeal from the United States District Court for the
Western District of Texas

Before KING, ELROD, and HAYNES, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.

IT IS FURTHER ORDERED that plaintiff-appellant pay to defendants-appellees the costs on appeal to be taxed by the Clerk of this Court.



**Certified as a true copy and issued
as the mandate on Oct 25, 2018**

**Attest:** *Lyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

—————————

No. 17-50840

—————————

United States Court of Appeals
Fifth Circuit

**FILED**

October 3, 2018

Lyle W. Cayce
Clerk

EMPLOYEES' RETIREMENT SYSTEM OF THE STATE OF HAWAII,

      Plaintiff - Appellant

v.

WHOLE FOODS MARKET, INCORPORATED; JOHN P. MACKEY; GLENDA JANE FLANAGAN; WALTER E. ROBB; A. C. GALLO; DAVID LANNON; KENNETH J. MEYER,

      Defendants - Appellees

—————————

Appeal from the United States District Court
for the Western District of Texas

—————————

Before KING, ELROD, and HAYNES, Circuit Judges.

KING, Circuit Judge:

Whole Foods Market, Inc.—an international grocery-store chain specializing in organic products—recently ran into trouble with several state and local consumer-protection agencies for weights-and-measures violations. On multiple occasions, Whole Foods admitted to mislabeling prepackaged foods such that it charged consumers for more food than the packages actually contained, in violation of national standards and local laws.

Whole Foods subsequently faced lawsuits from or on behalf of consumers who overpaid. This is not such a case. Rather, the plaintiffs in this putative class-action lawsuit allege that in perpetuating this weights-and-measures

No. 17-50840

fraud against customers, Whole Foods and several of its executives also defrauded Whole Foods shareholders in violation of federal securities law. The district court disagreed and dismissed the plaintiffs' complaint for failure to state a claim. For the reasons explained below, we AFFIRM.

## I.

We draw the following facts from the plaintiffs' second-amended complaint, documents attached to the complaint, and matters on which we may take judicial notice. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

## A.

The plaintiffs' allegations stem from a weights-and-measures scandal that began to brew as early as 2013 and boiled over in the summer of 2015. Principally, regulators in California and New York caught Whole Foods including the weight of packaging—"tare weight," in the industry parlance— in the price of many of its prepackaged products. As a result, Whole Foods effectively charged consumers more than the advertised price per pound for the affected products. This practice violates national weights-and-measures standards and various state and local laws that incorporate those standards.

The plaintiffs allege that the defendants knew about Whole Foods' weights-and-measures problems as early as February 2013, when it entered a tolling agreement with authorities in California who were investigating the issue. On June 11, 2014, this investigation culminated in a lawsuit the State of California and three California cities brought against Whole Foods in state court. Whole Foods settled that lawsuit within a week. As part of the settlement, Whole Foods agreed to refrain from further violations at its California stores and to implement procedures to ensure pricing accuracy. It also agreed to pay about $800,000 in fines, fees, and restitution. The state court issued an injunction that incorporated the terms of the settlement and retained

2

No. 17-50840

jurisdiction over the case to oversee Whole Foods' compliance.[1] Shortly thereafter, Whole Foods wrote an open letter to its customers in which it acknowledged unintentionally violating weights-and-measures standards and promised to improve its practices.

But the California settlement hardly marked the end of Whole Foods' woes. Regulators in Albany, New York fined Whole Foods for weights-and-measures violations in August 2014 and again in January 2015. Then, on June 24, 2015, the New York City Department of Consumer Affairs ("DCA") released a scathing report on Whole Foods' weights-and-measures practices. In a press release, the DCA said it uncovered violations at each of Whole Foods' stores in New York City. In fact, it reported that 89 percent of the products it tested failed to meet federal weights-and-measures standards, causing Whole Foods to overcharge customers between $0.80 and $14.84 per affected product. DCA inspectors characterized their findings as "the worst case of mislabeling they [had] seen in their careers."

Although Whole Foods officials initially denied the DCA's allegations, they soon pivoted to strike a conciliatory tone. On June 29, 2015, Whole Foods' co-CEOs John Mackey and Walter Robb—both defendants in this lawsuit— posted a video to Whole Foods' website admitting that the company had "made some mistakes" with regards to pricing in its New York City stores. Whole Foods simultaneously posted a statement on its website detailing policy changes it intended to implement to guard against future violations.

The DCA report and Whole Foods' subsequent apology received national media attention in the weeks that followed. The New York Times published an article highlighting the DCA's allegations the day they were released. USA

---

[1] The plaintiffs allege that Whole Foods violated this settlement continuously through at least August 2016.

No. 17-50840

Today and Forbes later published articles discussing Whole Foods' acceptance of responsibility. At least one market analyst weighed in with a report that discussed Whole Foods' "surprising apology for inaccurate pricing."

The plaintiffs allege that consumers took notice. Whole Foods' third-quarter financial data, which it released on July 29, showed that Whole Foods missed its sales targets for the quarter and demonstrated a marked slowdown in sales growth in the two weeks between the DCA's report and the end of the quarter. On a conference call with investors that evening, Robb and Whole Foods CFO Glenda Jane Flanagan—another defendant in this lawsuit—attributed the decline to the DCA findings and the negative press that it attracted. Market analysts concurred in this assessment. Whole Foods' common-stock price fell about ten percent the next day on high-volume trading.

**B.**

The putative class plaintiffs purchased Whole Foods common stock between July 31, 2013, and July 29, 2015. The plaintiffs say that during this period, Whole Foods made various fraudulent statements that artificially inflated the price of its stock. Then, the plaintiffs allege, when the extent of Whole Foods' weights-and-measures issues came to light, Whole Foods stock declined to reflect its true value, harming those investors that purchased the stock at artificially inflated prices.

The plaintiffs allege three general categories of statements that Whole Foods made, which (they say) the weights-and-measures scandal eventually revealed to be false. First, they challenge the defendants' frequent assertions that Whole Foods provides competitive pricing to its customers or is working to improve its pricing:

- On July 31, 2013, defendant Kenneth Meyer—a Whole Foods executive vice president—told investors on a conference call, "We don't have to be ashamed compared to

No. 17-50840

any other competitor for the exact same items we have great prices."

- On November 6, 2013, Mackey told investors on a conference call, "We have narrowed the price gap versus our competitors on known value items to its narrowest margin yet . . . ."

- On February 12, 2014, Robb told investors on a conference call, "Our internal pricing surveys showed improvements from Q4 to Q1, in a competitive price positioning across virtually all competitors in all areas . . . ."

- On February 21, 2014, Whole Foods stated in a Form 10-Q it filed with the SEC that it was "improving [its] relative price positioning[] [and] expanding its value offerings across the store."

- On May 6, 2014, Robb told investors on a conference call that Whole Foods was "continuing to make . . . investments strategically in price." On that same call, defendant A.C. Gallo, Whole Foods' president and COO, said Whole Foods was "really focused on being really competitive with [its] prices."

- On July 30, 2014, Robb told investors on a conference call, "[W]e believe our value efforts continue to be a key element in driving sales growth over the long-term," and "[o]ur focus going forward is primarily in perishables, where we see opportunities to narrow price gaps on select known value items."

- On November 5, 2014, Mackey told investors on a conference call, "We remain committed to the highest quality standards and to expanding our value offering." On that same call, defendant David Lannon—a Whole Foods executive vice president—said Whole Foods' internal testing showed it was "matching toe-to-toe with all of [its] competitors."

- On February 11, 2015, Robb told investors on a conference call, "We continue to see unit lift from the lower produce pricing we are testing in several markets . . . . [W]e believe

5

No. 17-50840

more competitive produce pricing will greatly benefit our overall value perception."

- On February 27, 2015, Mackey told an audience of investors that Whole Foods has "made investments in price in selected markets."

These statements are false, the plaintiffs insist, because prices on many Whole Foods products were effectively higher than advertised as a result of the weights-and-measures problem.

Second, the plaintiffs point to various proclamations the defendants made suggesting that Whole Foods holds itself to high standards for transparency, quality, and corporate responsibility:

- On November 6, 2013, Mackey told investors on a conference call that Whole Foods "continu[ed] to raise the bar even higher on [its] standards of transparency."

- On November 22, 2013, Whole Foods filed a Form 10-K with the SEC that stated Whole Foods "seek[s] to be a deeply responsible company in the communities where [it] do[es] business around the world, providing ethically sourced, high-quality products and transparent information to [its] customers."

- On March 12, 2014, Robb told an audience of investors, "Whole Foods Market has the highest standards in the supermarket industry of any company. . . . The transparency that is going to continue to unfold over the coming years, that is where we are the leaders and we will continue to be the leaders." He further remarked, "[I]t is not just the quality of the products; it is the quality of the standards behind the products."

- In its June 26, 2014, letter to customers about the California settlement, Whole Foods stated that it "always strive[s] for transparency and accuracy in everything [it] do[es]" and it "take[s] pride in setting higher standards for quality."

6

No. 17-50840

- On July 30, 2014, Robb told investors on a conference call, "Our brand and our marketing campaign will highlight both our value and our values, reinforcing our leadership around quality and transparency in the marketplace." On the same call, Mackey said, "We're going to remind our customers, and also people who don't know Whole Foods very well, what we really stand for, and how we're different and better than many of our competitors."

- On November 21, 2014, Whole Foods again filed a Form 10-K with the SEC in which it stated Whole Foods "seek[s] to be a deeply responsible company in the communities where [it] do[es] business around the world, providing ethically sourced, high-quality products and transparent information to [its] customers."

- On February 27, 2015, Mackey told an audience of investors, "[W]e're going to concentrate in building that new top for this industry: new levels of quality, new levels of transparency, new levels of accountability across the entire business."

- On May 6, 2015, Mackey stated in a press release, "Our Whole Foods Market brand has helped lead the shift in consciousness toward fresh, healthy foods by offering the highest quality, broadest selection, and best customer service. . . ."

The plaintiffs say these statements are false because—far from being transparent or responsible—Whole Foods was defrauding its customers, principally by charging them for tare weight.

Third, the plaintiffs claim that Whole Foods published inflated earnings statements by including in revenues receipts from fraudulently labeled products, in violation of generally accepted accounting principles ("GAAP"). Essentially, the plaintiffs say that because Whole Foods was overcharging customers on some prepackaged goods, every time it publicly announced its financial numbers—whether through regulatory filings, press releases, or

7

other communications—it exaggerated its earnings by taking into account money that it had actually received but had not actually earned. According to the plaintiffs, GAAP prevents a business from recording earnings until the business has substantially performed its obligation to become entitled to those earnings. Therefore, the argument goes, because Whole Foods' weights-and-measures violations prevented it from substantially performing its obligations to countless consumers, Whole Foods violated GAAP by counting the money it had collected from the defrauded customers as earnings.

As an illustration, consider a customer who purchases chicken at an advertised price of $5.00 per pound. If the package of chicken the customer selects is labeled as containing three pounds of chicken but actually contains only two pounds of chicken and one pound of tare weight, then (according to the plaintiffs) GAAP dictates that Whole Foods can only count $10.00 of the $15.00 it collects from the customer as earnings. If Whole Foods records all $15.00 from that transaction as earnings, then according to the plaintiffs, it has inflated its earnings by $5.00 allegedly in violation of GAAP. When this extra $5.00 is compounded by innumerable similar transactions, the plaintiffs assert that Whole Foods could have inflated its earnings by more than $100 million.

Thus, the plaintiffs allege that every time Whole Foods communicated its earnings to shareholders, it misled them by failing to discount money the company collected but did not earn because of its weights-and-measures problems. To give one of many examples that the plaintiffs point to, Whole Foods on February 11, 2015, announced that it took in $167 million in net income for the first quarter of 2015. The plaintiffs allege that this number is overstated because it accounts for receipts fraudulently collected in exchange for tare weight, which—consistent with GAAP—Whole Foods should not have counted towards its net income.

No. 17-50840

## C.

Yochanan Markman, a Whole Foods stockholder, initially brought this action in the district court against Whole Foods, Mackey, Robb, and Flanagan. Markman alleged that the defendants each violated § 10(b) of the Securities Exchange Act of 1934 by deceiving Markman and other investors into purchasing Whole Foods stock at artificially inflated prices. He further alleged that the individual defendants violated § 20(a) of the Securities Exchange Act by controlling Whole Foods' unlawful conduct. And he purported to represent a class of similarly situated plaintiffs pursuant to Federal Rule of Civil Procedure 23.

The district court later substituted the Employees' Retirement System of the State of Hawaii (the "Retirement System") as the lead plaintiff. The Retirement System filed an amended complaint in which it added corporate officers Gallo, Meyer, and Lannon as defendants. On the defendants' motion, the district court dismissed the amended complaint without prejudice. It first concluded that the plaintiffs failed to sufficiently allege that any of the defendants made a materially false statement in violation of § 10(b). It held that the statements about transparency, integrity, and quality were all nonactionable puffery. It next held that the plaintiffs failed to allege the defendants' statements about Whole Foods competitive pricing were actually false or misleading. And it held that the plaintiffs failed to allege Whole Foods' financial statements were fraudulent with sufficient particularity because it did not point to any specific instances of Whole Foods recording unearned money as revenue. It alternatively held that the plaintiffs failed to allege specifically that any of the defendants knew or should have known the falsity of the various statements when made. And it explained that because the plaintiffs did not sufficiently plead a misrepresentation, they also failed to

No. 17-50840

plead that the defendants caused their loss. It also dismissed the plaintiffs' § 20(a) claims as dependent on the § 10(b) claims.

The Retirement System filed a second amended complaint, which included additional factual allegations. Most notably, the Retirement System attached an affidavit that a Whole Foods data analyst prepared for a separate lawsuit, which detailed Whole Foods' total sales on certain perishable products in New York State between June 2012 and June 2015. The defendants again moved to dismiss and the district court again granted the defendants' motion—this time with prejudice. The district court explained that the affidavit did not cure the plaintiffs' prior pleading deficiencies because its conclusion was hypothetical and was "based on aggregate sales and inventory records not pertaining to the weight and pricing of prepackaged products." It further concluded that the plaintiffs' new allegations about the defendants' knowledge still failed to identify what each individual defendant knew about the falsity of his statements. It accordingly concluded that the plaintiffs again failed to state a § 10(b) claim and therefore also failed to state a derivative § 20(a) claim. The plaintiffs appeal.

## II.

We review orders dismissing a complaint for failure to state a claim de novo. *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 705 (5th Cir. 2017). For a claim to survive the motion-to-dismiss stage, it must state plausible grounds for relief. *See Peña v. City of Rio Grande City*, 879 F.3d 613, 618 (5th Cir. 2018). A claim states plausible grounds for relief when—assuming the truth of all the plaintiff's nonconclusory allegations and viewing them in the light most favorable to the plaintiff—we can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

No. 17-50840

Generally, a "short and plain statement" that shows a plausible claim for relief will suffice. Fed. R. Civ. P. 8(a)(2). But a plaintiff that alleges fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To fulfill Rule 9's particularity requirement, we have explained that a plaintiff must "identify[] the 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby.'" *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)). A federal securities-fraud plaintiff must additionally comply with the pleading requirements set forth in the Private Securities Litigation Reform Act ("PSLRA"). *See id.* The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). It further requires that to the extent a plaintiff must prove the defendant acted with a particular state of mind, the plaintiff "shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2)(A).

## III.

The plaintiffs claim the defendants violated § 10(b) of the Securities Exchange Act. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." *Id.* § 78j(b). In turn, SEC Rule 10b-5 makes it unlawful to, in connection with the sale of a security, "make any untrue statement of a material fact or to omit to state a

No. 17-50840

material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Courts have read Section 10(b) and Rule 10b-5 to create an implied private right of action for victims of securities fraud. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).

In cases like this one where a plaintiff alleges the fraud occurred in the public securities market, we have explained,

> [T]he action's basic elements are: (1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation"; (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

*Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238-39 (5th Cir. 2009) (quoting *Dura*, 544 U.S. at 341-42).

Below, the district court dismissed the plaintiffs' § 10(b) claims because it determined the plaintiffs failed to properly allege a material misrepresentation, scienter, or loss causation. The defendants do not dispute that the plaintiffs allege the other elements of a § 10(b) claim.

Recall that the plaintiffs allege the defendants made repeated false statements, each of which falls into one of three general categories: (1) statements touting Whole Foods' price competitiveness or efforts to increase its price competitiveness; (2) statements about Whole Foods' commitment to transparency, quality, and corporate responsibility; and (3) statements announcing Whole Foods' allegedly inflated revenues. We conclude that the first two categories do not constitute material misrepresentations under § 10(b). As for the third category, we conclude that even assuming such statements were material falsehoods, they did not cause the plaintiffs' loss.

No. 17-50840

## A.

We agree with the district court that the plaintiffs fail to allege that the defendants' particular statements about Whole Foods' prices are false. First, it does not follow that Whole Foods' weights-and-measures issues rendered false the defendants' statements about Whole Foods decreasing its prices. The fact that Whole Foods' prices at the time of these statements were effectively higher than advertised does not mean that the prices were higher than they had been previously. Otherwise put, if Whole Foods decreased the price of chicken from $5.00 per pound to $4.00 per pound, the price would drop regardless of whether Whole Foods impermissibly charged customers for tare weight. Thus, when, for example, Robb said in a February 12, 2014, conference call that Whole Foods' "internal pricing surveys showed improvements from" the fourth quarter of 2013 to the first quarter of 2014, nothing that the plaintiffs allege about Whole Foods' weights-and-measures problems makes that statement false. The plaintiffs cannot plausibly allege that the defendants lied about improving Whole Foods' prices without comparing the prices at the time of the alleged misrepresentations with prior prices. As the plaintiffs make no such comparison, they fail to allege these statements were misleading.

Similarly, the plaintiffs fail to allege that Whole Foods' true prices were not comparable to its competitors' prices or were otherwise unattractive to consumers. The plaintiffs essentially ask us to assume that because Whole Foods' effective prices were revealed to be higher than advertised, the defendants must have lied when they characterized Whole Foods' prices as "competitive." But this conclusion is not inevitable; just because Whole Foods' prices were not *as* competitive as advertised, it need not follow that they were not competitive. It is certainly possible that even if Whole Foods' advertised prices accurately reflected the amount customers were charged when taking tare weight into account, those prices would nevertheless be comparable to

No. 17-50840

Whole Foods' competitors. The plaintiffs do not provide any point of comparison that might show Whole Foods' true prices were genuinely uncompetitive. Therefore, we conclude the plaintiffs fail to plausibly allege with requisite particularity that the statements about Whole Foods' price competitiveness were misleading. Accordingly, the plaintiffs cannot state a § 10(b) claim based on the defendants' comments about Whole Foods' prices.

**B.**

We also agree with the district court that the defendants' comments about Whole Foods' commitments to transparency and quality—even if false— are immaterial. "A misstatement or omission is material if 'there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003) (alteration in original) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). We have explained that a company's "generalized, positive statements" are immaterial because they do not alter a reasonable investor's assessment of the company's prospects. *Id.* at 869; *see also ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (holding that bank's statements about its integrity were "too general to cause a reasonable investor to rely upon them"); *City of Monroe Emp.'s Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) ("[S]tatements describing a product in terms of 'quality' or 'best' or benefitting from 'aggressive marketing' are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision."); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) ("Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen.").

14

No. 17-50840

We conclude that, as the district court held, the defendants' generalized statements about Whole Foods' transparency, quality, and responsibility are the sort of puffery that a reasonable investor would not rely on. On appeal, the plaintiffs do not dispute that such puffery is generally immaterial. But they say this case is different because Whole Foods has built a brand around holding itself to higher ethical standards than its competitors. Maybe so, but that does not change the fact that a reasonable investor will not judge Whole Foods' value based on its own generalized and self-serving statements.

The Second Circuit rejected a similar argument in *Local 134 IBEW*. *See* 553 F.3d at 205-06. In that case, a bank's shareholders alleged that it made numerous false statements touting its reputation. *See id.* The shareholders argued that the statements were material because "the significance of a bank's reputation is undeniable." *Id.* at 206. The court agreed with the plaintiffs' premise but explained that in reaching their conclusion, the "[p]laintiffs conflate[d] the importance of a bank's reputation for integrity with the materiality of a bank's statements regarding its reputation." *Id.* That is, although a reasonable investor would certainly consider the bank's integrity to be relevant to its investment decision, a reasonable investor would not take the bank at its word that it indeed possesses the integrity it claims. *See id.* ("No investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements."). The same is true here. Surely it matters to investors whether Whole Foods is transparent and otherwise holds itself to high standards. But reasonable investors will not simply take Whole Foods' word for it. They will "rely on facts" to determine whether this is so. *Raab*, 4 F.3d at 290.

Accordingly, as the district court correctly held, the plaintiffs cannot state a § 10(b) claim based on the defendants' generalized statements about Whole Foods' transparency, quality, and integrity.

15

No. 17-50840

## C.

All that remains is the plaintiffs' claim that the defendants consistently exaggerated Whole Foods' financial results by counting towards its revenues receipts that Whole Foods fraudulently collected by overcharging customers. The plaintiffs allege that GAAP forbids an entity from counting money received as revenue unless "the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." Thus, the plaintiffs reason that whenever Whole Foods sold products to customers that weighed less than represented on the label, it had not "substantially accomplished what it must do to be entitled to" the portion of the purchase price that exceeded the advertised price. Accordingly, the plaintiffs insist that to the extent Whole Foods counted any such money as revenue, it did so in violation of GAAP. And because financial statements in violation of GAAP are presumptively misleading,[2] the plaintiffs conclude that the defendants' statements about Whole Foods' revenues during the class period amount to misrepresentations under § 10(b).

## 1.

The district court rejected this argument because it concluded the plaintiffs failed to plead falsity with the particularity Rule 9(b) and the PSLRA require. On appeal, the plaintiffs point to an affidavit that Whole Foods presented to establish federal subject-matter jurisdiction in a separate lawsuit. The plaintiffs extrapolate from the affidavit's analysis to allege that "Whole Foods overstated its revenues by $127.7 million" during the relevant period.[3]

---

[2] *See* 17 C.F.R. § 210.4-01(a)(1) ("Financial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the [SEC] has otherwise provided.").

[3] Whole Foods reported approximately $26 billion in sales during the class period.

No. 17-50840

The plaintiffs argue this allegation suffices to plead with particularity that Whole Foods fraudulently inflated its revenue.

The plaintiffs have a threshold problem. Even if this affidavit sufficiently establishes the total amount by which Whole Foods overcharged its customers, the plaintiffs make no attempt to plead how much of its revenue Whole Foods overstated in "*each* statement alleged to have been misleading." § 78u-4(b)(1) (emphasis added). But we need not answer this question. Even assuming arguendo that the plaintiffs allege falsity in reported revenues with particularity,[4] we nonetheless affirm because the plaintiffs do not allege that Whole Foods' inflated revenues caused the plaintiffs' loss.

## 2.

As discussed above, a § 10(b) claim requires the plaintiff show that the defendant's misrepresentation caused the plaintiffs' loss. Where, as here, a plaintiff pursues a fraud-on-the-market theory, "the plaintiff must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm." *Pub. Emp.'s Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014) (quoting *Lormand*, 565 F.3d at 255). If the stock does not depreciate, then "it cannot be

---

[4] Additionally, on this record we are unsure whether Whole Foods' failure to discount the money it overcharged customers from its reported revenue is indeed a GAAP violation—or at least a GAAP violation that amounts to a material misrepresentation. Whole Foods actually collected this money, and the plaintiffs do not make any allegations that defrauded customers collected refunds. Further, nowhere in this record is an explanation of what the appropriate accounting for any of these disparities would look like. Notably, the Retirement System's counsel was unable to explain at oral argument what steps Whole Foods' accountants should have or even could have taken in this circumstance to comply with GAAP. Thus, the plaintiffs' attempt to stretch Whole Foods' weights-and-measures malfeasance into accounting malfeasance strikes us (particularly on this record) as strained. Nevertheless, because disputes over proper accounting methods often turn on fact questions not appropriately addressed at the motion to dismiss stage, *see Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257-58 (5th Cir. 2005), we explore this question no further and assume without deciding that the plaintiffs have adequately pleaded a material misrepresentation.

No. 17-50840

said that there is in fact an economic loss attributable to that misrepresentation." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000). Rather, "the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price." *Id.*

We have prescribed the following framework through which fraud-on-the-market plaintiffs can show loss causation:

> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is *more probable than not* that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of price drop.

*Amedisys*, 769 F.3d at 321 (quoting *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1311-12 (11th Cir. 2011)). Importantly, the corrective disclosure must reveal some information not already known to the market, otherwise "the stock price would have incorporated that information, and its disclosure could not have caused a loss." *Alaska Elec. Pension Fund v. Asar*, 898 F.3d 648, 665 (5th Cir. 2018). But a series of partial disclosures may suffice if "the whole is greater than the sum of its parts." *See Amedisys*, 769 F.3d at 324-25.

The plaintiffs allege that their loss occurred when Whole Foods' stock price dropped about ten percent on July 30, 2015, the day after it released its third-quarter numbers showing a substantial slowdown in sales growth. But the plaintiffs do not allege that the defendants revealed any new information about Whole Foods' unfolding weights-and-measures scandal in the July 29 press release or conference call. Indeed, the plaintiffs do not allege that any new information about Whole Foods' overcharging had come out since the DCA released its findings more than a month prior. The market did not significantly

18

No. 17-50840

react at that point, even amidst considerable national media coverage about Whole Foods' weights-and-measurements problems. Therefore, the market was well aware for weeks before the July 30 decline that Whole Foods had been overcharging customers (and therefore, according to the plaintiffs, overstating its revenues).

The plaintiffs do not dispute this. But they nevertheless argue that the drop in sales growth revealed on July 29 was a partial disclosure because it showed the financial impact of previously revealed fraud. Yet the plaintiffs do not argue that the fraud allegedly actionable in *this* case—i.e., Whole Foods' overstated revenues—in any way caused the disappointing sales. Rather, the plaintiffs allege that revenues failed to meet expectations because Whole Foods' customers took exception to the possibility of being defrauded and voted with their feet. This is certainly a plausible inference. But the plaintiffs do not premise their § 10(b) claims on Whole Foods' misrepresentations to its *customers*; rather, they base the claims on Whole Foods' alleged misrepresentations to its *shareholders* through its accounting errors. Nor do the plaintiffs allege that the disappointing sales numbers somehow represented customer dissatisfaction with Whole Foods' accounting practices.

The plaintiffs' apparent error is that they conflate the nonactionable weights-and-measures fraud with the allegedly actionable securities fraud. The relationship between the weights-and-measures fraud and the plaintiffs' loss (the decline in the stock price) is causal; the relationship between the alleged securities fraud and the plaintiffs' loss is spurious. Whole Foods' overcharging caused (1) the alleged accounting problems and (2) the public-relations problems. The public-relations problems arguably led to slowed sales and the loss in stock price. But the accounting problems did not cause the public-relations problem, nor do the plaintiffs allege that the accounting problems caused a separate loss in stock price.

No. 17-50840

To illustrate, consider a counterfactual scenario in which Whole Foods overcharged its customers but its accountants did not record the ill-gotten receipts as revenue. In all likelihood, upon learning about the overcharging, consumers would have reacted just as negatively, Whole Foods' sales growth would have dropped just as much, and its stock price would have declined all the same. When the stock declined on July 30, 2015, the plaintiffs would have suffered the exact same harm regardless of whether Whole Foods had overstated its revenue. Nothing in the plaintiffs' complaint suggests otherwise.

Accordingly, the plaintiffs fail to identify a decline in stock price that shortly followed a corrective disclosure. They therefore fail to plead a § 10(b) violation. *See Amedisys*, 769 F.3d at 321; *cf. Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 223 (3d Cir. 2006) (concluding § 10(b) counterclaimant failed to show loss causation because record revealed "absolutely no connection between the price decrease in [the stock] and [the plaintiff's] unrelated alleged misrepresentation as to its intent to comply with offshore registration requirements"). Their § 20(a) claims likewise fail because they are derivative of the plaintiffs' § 10(b) claims. *See Rosenzweig*, 332 F.3d at 863.

## IV.

For the foregoing reasons, we AFFIRM the district court's judgment.

Print Form

## BILL OF COSTS

**NOTE: The Bill of Costs is due in this office *within 14 days from the date of the opinion, See* Fed. R. App. P. & 5th Cir. R. 39. Untimely bills of costs must be accompanied by a separate motion to file out of time, which the court may deny.**

Employees' Retirement System of the State of Hawaii          v.  Whole Foods Market, Incorporated, et al.          No. 17-50840

The Clerk is requested to tax the following costs against:  Appellant, Employees' Retirement System of the State of Hawaii _____

| COSTS TAXABLE UNDER Fed. R. App. P. & 5th Cir. R. 39 | REQUESTED | | | | ALLOWED (If different from amount requested) | | | |
|---|---|---|---|---|---|---|---|---|
| | No. of Copies | Pages Per Copy | Cost per Page* | Total Cost | No. of Documents | Pages per Document | Cost per Page* | Total Cost |
| Docket Fee ($450.00) | | | | | | | | |
| Appendix or Record Excerpts | 4 | 40 | 0.15 | 24 | 4 | 40 | .15 | 24.00 |
| Appellant's Brief | | | | | | | | |
| Appellee's Brief | 7 | 55 | 0.15 | ~~57.75~~ | 7 | 52 | .15 | 54.60 |
| Appellant's Reply Brief | | | | | | | | |
| Other: | | | | | | | | |

Total $ ~~81.75~~          Costs are taxed in the amount of $ 78.60

Costs are hereby taxed in the amount of $ __78.60__ this _____25th_____ day of _____October_____, _____2018_____.

State of
County of _____

LYLE W. CAYCE, CLERK

By _____          _____
                                              **Deputy Clerk**

I __Gregory J. Casas_____, do hereby swear under penalty of perjury that the services for which fees have been charged were incurred in this action and that the services for which fees have been charged were actually and necessarily performed. A copy of this Bill of Costs was this day mailed to opposing counsel, with postage fully prepaid thereon. This __17th_____ day of __October_____, 2018_____.

/s/ Gregory J.
                                              **(Signature)**

**\*SEE REVERSE SIDE FOR RULES GOVERNING TAXATION OF COSTS**

Attorney for  Appellees, Whole Foods Market, Inc., et al.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

October 25, 2018

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

      No. 17-50840   Yochanan Markman v. Whole Foods Market,
                      Inc., et al
                      USDC No. 1:15-CV-681

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

Enclosed for the district court and counsel is the approved bill
of costs.

                      Sincerely,

                      LYLE W. CAYCE, Clerk

                      By: _____
                      Debbie T. Graham, Deputy Clerk

cc:
      Ms. Susan Katina Alexander
      Mr. Gregory John Casas
      Mr. Jason Scott Lewis
      Mr. Andrew Love
      Honorable Jesse Wadell Wainwright
      Mr. Shawn A. Williams